## VIGGO E. BIRD *v.* THE CONNECTICUT POWER COMPANY ET AL.

BALDWIN, O'SULLIVAN, WYNNE, KING and MURPHY, Js.

Argued April 3—decided July 2, 1957

*Morgan P. Ames,* with whom, on the brief, was *Clifford R. Oviatt, Jr.,* for the appellant (plaintiff).

*Cyril Coleman,* with whom, on the brief, were *H. Bissell Carey, Jr.,* and *Edmund W. O'Brien,* for the appellees (defendants).

WYNNE, J. The plaintiff instituted this action to recover pension payments alleged to be due from the defendants. Upon the trial of the case to the jury, the court directed a verdict in favor of the defendants. The plaintiff has appealed, assigning as error the direction of the verdict, the refusal to set it aside, and certain rulings on evidence which, in the view we take of the case, have become academic.

Considered in the light most favorable to the plaintiff, the evidence would have justified the jury in finding the following facts: The defendant Hartford Electric Light Company, hereinafter called Light, is a public utility furnishing electricity to Hartford and its environs. The defendant Connecticut Power Company, hereinafter called Power, is a public utility supplying gas and electricity to various parts of Connecticut. Administratively, the two companies have worked closely together. As of 1939 their employees exceeded 6000 in number.

The plaintiff, who became sixty-five years of age on April 29, 1950, is presently working the year round as an accountant for his son-in-law, the owner of a large estate in Europe. The accounting is so arranged that the plaintiff is able to perform it while spending six months in Cos Cob, where he lives with another son-in-law, and six months abroad. The plaintiff was born in Denmark. He was graduated from the Massachusetts Institute of Technology in

1908. He entered the employ of Stone and Webster, an organization which managed public utilities, and after approximately a year in office work became assistant superintendent of the Fall River Gas Works, a Stone and Webster enterprise. In 1910 he became superintendent. During that year he was married. In 1913 he became, at a salary of $3000 a year, manager of the New London division of Power, at that time another Stone and Webster enterprise. In 1920 Stone and Webster sold all of its holdings in Power to Light. In 1922 the plaintiff became general manager of Power with an office in New London. He was given the title of assistant to the president. Samuel Ferguson was then president of Power and also of Light. While in New London, the plaintiff was elected treasurer of the First Congregational Church and was appointed superintendent of its Sunday school.

The plaintiff became a director of Light in 1926 and of Power in 1929. In the latter year he was appointed executive vice president of Light and moved to Hartford. In 1933 he became president of Power and in 1935 president of Light. In each instance he succeeded Ferguson, who became chairman of the board of directors of each company. The plaintiff received steady advances in salary until by 1939 his salary from Light was $28,000 a year and from Power, $12,000. He also received $5000 a year as treasurer of the New London Northern Railroad Company, an organization totally distinct from the defendants. The plaintiff worked closely with Ferguson, who continued to act as chief executive officer even after the plaintiff had become president of both defendants. Ferguson concerned himself chiefly with pensions and financial matters, and the plaintiff with employee and public relations and the

problems of general management. All officers of both companies looked to Ferguson for guidance and leadership.

Until at least 1929, the plaintiff, his wife and four children lived a happy, active life. And until that year his health and mental outlook were good. While he was living in New London, one of his close friends was his neighbor Edward S. Harkness, a wealthy philanthropist. In 1928 the plaintiff gave his savings of $10,000 to a broker to invest in the stock market. When the financial crash of 1929 occurred, the plaintiff was wiped out and became in debt to the extent of $224,000. He borrowed from various banks to cover this indebtedness, using as collateral securities wrongfully taken from the First Congregational Church in New London and from the New London Northern Railroad Company. At the end of October, 1929, he disclosed his financial condition to Harkness, who lent him $224,000 so that he could repay his bank loans and restore the securities he had converted. He committed himself to repaying Harkness at the rate of $24,000 a year, although his total annual income at that time was only $33,000. His life after he was elected president of Light entailed heavy expenses which he could not afford. His conscience troubled him and he withdrew into a shell, becoming close to a nervous wreck. He was unable to sleep, lost his appetite and was very depressed. As a result of paying $24,000 a year to Harkness, the plaintiff went into debt again. He again resorted to the use of the securities of the railroad company to facilitate his personal bank loans and again began to play the market in the hope of making sufficient profit to pay off his debts. Whenever the auditor of the railroad was due to examine its securities in connection with the annual audit, the plaintiff would

sell the securities which he had purchased with the proceeds of the bank loans secured by the securities of the railroad. This enabled him to repay the loans, retrieve from the banks the converted securities and return them to the safe deposit box of the railroad to be checked by the auditor. Then when the audit had been made, the plaintiff would once more take the securities of the railroad, borrow again from the banks upon hypothecating those securities, and use the proceeds in the market. This procedure continued from 1932 until 1939.

In 1939 Ferguson told the plaintiff that he had been advised that there was something wrong with the securities of the railroad. The plaintiff admitted that he had taken them and used them as collateral for personal loans. He then said to Ferguson: "Sam, now that it has all come out, I want to do everything I can to save these companies trouble . . . . Of course there will be publicity, even though I have never touched a cent, not one red cent belonging to either company. There will be publicity and I'm willing to do anything you want me to do. If you want me to resign, I'll resign from both companies right now, but I want your assurance that my 26 years of service will entitle me to a pension when I'll reach 65, that I've earned under the combined insurance plans of the two companies." As the result of Ferguson's answer, the plaintiff resigned in writing as president of both defendants. Later that day he went to bed in a state of complete mental and physical collapse. The state's attorney for Hartford County issued an information against him, and on April 3, 1939, he was arraigned and entered a plea of guilty to the charge of embezzlement. He received a sentence of two to five years in the state prison. There he was subjected to a physical and mental examina-

tion. A note on the psychiatric record indicates that the plaintiff was fifty-four years old but had a mental age of twelve years nine months and an IQ of eighty. At that time he was depressed and not himself mentally. He was put to work in the prison kitchen but was not treated for any ailment by any physician at the prison, nor did he request such attention. After a few weeks he was transferred to Osborn Prison Farm, where he worked in the garden and the orchard. In the fall he set up a cost accounting system which is still in use. From 1929 to 1939 the plaintiff was suffering from an emotional illness, which, however, did not prevent his doing a good day's work in a position of great responsibility.

Before the institution of an insured pension plan in 1934 by Light and in 1935 by Power, no pension plan had been adopted by the board of directors of either company. In fact, from the date of incorporation of Light, in 1881, until the institution of its insured plan in 1934, only ten retired employees had been given payments of any kind. These payments ranged in amounts from 29 per cent to 50 per cent of the salary which they were receiving on retirement, and of the ten employees, only one retired at the age of seventy. All the others were retired at an earlier age because of physical disability. From the incorporation of Power in 1913 to the institution of its insured pension plan in 1935, only two employees, upon retirement, received payments of any kind. One of them, retiring at seventy-six continued to receive $65 per month, which was the amount he was receiving at the time of his retirement; the other, retiring at sixty-three for disability, received $52 a month as against the $130 he was getting at the time of retirement. His retirement payment was later increased to $75 per month.

The insured pension plans adopted in 1934 and 1935, respectively, were contributory in that the employer and the employee joined in paying the premiums to the insuring company. Since the insured plans made no provision for services rendered by employees before the effective date of the plans, the boards of directors voted in individual cases to make voluntary payments to supplement those made by the insurance company. These voluntary payments were determined by the need, station in life and value of the services rendered by the employee. They were generally about 50 per cent of the salary at the time of retirement, and they were subject to the pleasure of the board. From the institution of its pension plan in 1934 up to October 29, 1951, Light made voluntary supplementary payments to 122 employees who retired at or about the normal retirement age and to 19 employees who retired prior to that age, usually because of physical disability. From 1935 until the same date in 1951, Power made similar payments to 117 employees who retired at about the normal age and to 35 employees who retired prior to that age, usually because of physical disability. The procedure adopted for the determination of these voluntary supplementary payments was a review of each employee's case by a so-called pension committee of officials, recommendation to the appropriate board of directors by that committee, and action by that board of directors. In the case of an officer about to retire, a senior officer rather than the pension committee investigated and reported to the board for action.

The plaintiff gave up other opportunities for employment because of the security he felt the pension benefits of the defendants afforded him. He joined the insured plans and is receiving retirement

payments under them. In this action he seeks supplementary payments from the defendants.

A board of directors cannot legally strip an employee of the benefits of a pension plan where the employee has complied with the terms of the offer of a pension, since the purposes of the plan could be readily frustrated at the whim of the directors. *Forrish* v. *Kennedy,* 377 Pa. 370, 376, 105 A.2d 67; *Wilson* v. *Rudolph Wurlitzer Co.,* 48 Ohio App. 450, 454, 194 N.E. 441. Even where an employer declares the plan is within the absolute discretion of the directors, the court will interpret the plan as a whole so as to give effect to its general purpose in securing the loyalty and continued service of the employees, and the employer may not defeat the employees' reasonable expectations of receiving the promised reward. *Mabley & Carew Co.* v. *Borden,* 129 Ohio St. 375, 379, 195 N.E. 697; *Orton & Steinbrenner Co.* v. *Miltonberger,* 74 Ind. App. 462, 468, 129 N.E. 47; *Menke* v. *Thompson,* 140 F.2d 786, 791. In *Tilbert* v. *Eagle Lock Co.,* 116 Conn. 357, 165 A. 205, on which the plaintiff relies, the offer of the company was to pay a death benefit for employees who died while in its employ. It reserved the right to discontinue the benefit system. We held that, since the law takes no cognizance of fractional days, the company's discontinuance of the benefit system on the day of the death of a certain employee could not operate to withdraw the benefit which became payable by reason of that death.

It is obligatory on the employee to remain in the employer's employ, if that is the basis for the pension, unless his leaving is due to a physical or mental disability. Hence, the vital question in the case at bar is whether the plaintiff left because of such a disability.

The jury could not in reason have found other than that the cause of the plaintiff's leaving the defendants' employ was his voluntary act of resigning upon the disclosure of his own wrongdoing, and they could not in reason have found that his leaving was due to mental or physical disability. Whatever the mental or physical condition of the plaintiff was at the time of his resignation, the jury would have had to find that that condition had been superseded as a proximate cause of his inability to carry on his employment by the disclosure of his criminal misconduct and the resultant probability, which soon became an actuality, that he would be confined in prison. The trial court, therefore, did not err in directing the verdict or in refusing to set aside the directed verdict.

There is no error.

In this opinion the other judges concurred.