James WYPER, Jr., Plaintiff-Appellant,

v.

PROVIDENCE WASHINGTON
INSURANCE COMPANY,
Defendant-Appellee.

No. 439, Docket 75–7347.

United States Court of Appeals,
Second Circuit.

Argued Jan. 30, 1976.

Decided April 1, 1976.

Paul W. Orth, Hartford, Conn. (Hoppin, Carey & Powell, Hartford, Conn., of counsel), for plaintiff-appellant.

George Muir, Hartford, Conn. (Gordon, Muir & Foley, Hartford, Conn., of counsel), for defendant-appellee.

Before HAYS, MULLIGAN and GUR-FEIN, Circuit Judges.

GURFEIN, Circuit Judge:

The plaintiff-appellant, a former employee and president of the Providence Washington Insurance Company, sued the company in the United States District Court for the District of Connecticut, for breach of contract. He claimed that the company improperly failed to award him a pension of $20,000 a year for life which he was entitled to because he had allegedly become, while in its employ, physically and mentally incapacitated through the disease of alcoholism. Jurisdiction rests on diversity of citizenship. 28 U.S.C. § 1332. Appellee pleaded the general issue with the affirmative defense of release.

The case was tried to a jury and at the close of the plaintiff's case, the trial court (Blumenfeld, *Judge*) directed a verdict in favor of the defendant.[1] This appeal followed. For reasons that will appear, we affirm.

I

In 1966, and for many years before, appellant had been an employee of the Hartford Fire Insurance Company and had attained an executive position. In September 1966, appellant left to become executive vice president of appellee with the understanding that he would shortly thereafter become president. At the time, appellee agreed that appellant would be credited under its pension plan with past prior service from September 1, 1940. Appellee has not denied that it assumed this obligation. Appellant remained in appellee's employ less than two years, leaving the company on May 7, 1968. Since appellant has not yet reached age 65, he has no present claim for regular retirement benefits under the plan.

The appellant alleges that he is entitled to benefits, however, as an "incapacitated" person under the pension plan, the relevant portion of which reads as follows:

". . . any employee who, after being ten years continuously in the service of the Company, shall become physically or mentally incapacitated to fill his or her position may be retired by a majority vote of the Pension Board from active service.

"Service with other similar institutions may be considered as with this Company for the purpose of calculating the term of service."[2]

Appellant claims that he is entitled to be paid about $20,000 a year for the rest of his life because of his alleged incapacity "to fill his position," resulting from alcoholism. He failed to present such a claim at the time of his severance from the company. He asserts the claim in this action brought four-and-one-half years later. Drawing all reasonable inferences from the evidence in the light most favorable to the plaintiff, 5A Moore's Federal Practice ¶ 50.02[1]; *Pinto v. Spigner*, 163 Conn. 191, 192–93, 302 A.2d 266, 267 (1972), we find that a jury, accept-

---

1. Judge Blumenfeld's opinion was delivered orally and is not reported.

2. We assume that the company was contractually bound to consider appellant's past service with Hartford.

ing the credibility of all favorable witnesses, could have found as follows:

After about one year in the new employment, plaintiff, who had always been a social drinker, began to drink more heavily. By late 1967, he manifested various physical symptoms associated with alcoholism and, after a brief period "on the wagon" in December, renewed his drinking to a greater and greater extent. His former wife testified that beginning in early 1968, several months before his severance, her then husband would sometimes consume two or three drinks at breakfast, and would return home in an intoxicated condition after work. She also testified that in March 1968 (about a month before his decision to resign), her husband was so intoxicated one Saturday morning that after leaving to play tennis with Mr. Branch, chairman of the board of defendant, he returned home within twenty minutes.

Three former officers of the company also testified for appellant. Each stated that he had observed Mr. Wyper dozing off at important meetings of company officers and directors, and that he often smelled of liquor. One testified that shortly before a directors' meeting in 1968, plaintiff was unable to conduct a scheduled review of financial matters, apparently on account of his intoxicated condition. Another witness testified that in the spring of 1968 he had a conversation with plaintiff to inform him that "talk" about his drinking problem was going around the company to his discredit. It may be inferred that, shortly before his severance, his excessive drinking had become generally known in the company.

Following a meeting of the Board of Directors in early April 1968, plaintiff was informed "that he was not the man for the job." It was apparently understood by all concerned that plaintiff would either have to resign or would not be elected again at the directors' meeting following the annual shareholders' meeting. Plaintiff decided to resign in one month, after he would have conducted the forthcoming annual shareholders' meeting on May 7, 1968. Plaintiff attributed his decision at the time to machinations of specific directors on the board, not conceding that he was incompetent (and certainly not that he was incapacitated) to "fill his position" as president. There was some evidence that the company preferred to have plaintiff resign rather than to be compelled not to rehire him in order to minimize any claims he might have against the company.

With respect to his actual physical and mental condition during the month preceding his resignation, the following could be found: Plaintiff drove to and from work every day. He was present at directors' meetings and at the annual shareholders' meeting. At home, however, his wife testified that she stopped consulting him on family matters because "his answers made no sense," and that he did not perform his usual household chores. Plaintiff himself testified at trial and at deposition that he felt himself quite competent to perform his job in the months preceding his resignation. He acknowledged that his drinking got worse during the last month of employment, because his resignation was already imminent and raised obvious personal problems. At one point, he testified that he was incapacitated from performing his job through that last month. Nowhere in his testimony did appellant claim that he had been incapacitated from performing his job earlier than during the last month—when he already knew he was leaving. He testified, however, that from late 1967 through May 1968, there were certain days when he could not function well because of excessive drinking.

On May 7, 1968, appellant was able to conduct, and did conduct, the annual stockholders' meeting as president of the company. At the board of directors' meeting which followed, the board voted to grant appellant three months' severance pay if he would sign a letter of resignation and a release form prepared by Mr. Branch. The release was signed by appellant that afternoon. Appellant testified that following this meeting he had three drinks. He remembers none of the subsequent events of the day, and, accordingly, does not recall

signing the release. He concedes, however, that the signatures on the letter of resignation and release form both dated May 7 are his. The release states that appellant has accepted three months' severance pay "in full satisfaction of all claims" against the defendant except those as a stockholder. Though appellant testified that he did not recall signing the release, he also testified that he did not intend to sign away his pension rights.

Testimony of two physicians was also introduced. Dr. Fischer, who testified by deposition, examined the plaintiff on April 25, 1968, twelve days before his severance, and concluded that plaintiff was an alcoholic and had been such for several months. He observed an enlarged liver, as well as other physical symptoms, but refused to offer an opinion on whether plaintiff was "incapacitated" to perform his job. He simply said that a person in plaintiff's condition would probably not function well in any job if he was drinking. Dr. Fischer saw appellant again on May 25, 1968, at which time he noted "Alc—very little—" and "omit alc" [sic]. Dr. Nichols testified at trial. He first examined plaintiff on June 3, 1968, a month after the severance, and found the liver quite enlarged and distended on physical examination, and found certain degrees of liver disturbance through chemical testing. The physical appearance of plaintiff was that of an alcoholic. Dr. Nichols stated that at the time of examination, plaintiff was an alcoholic, and the state of his physical condition suggested he had been an alcoholic for at least two or three months. He stated as a conclusion that on June 3rd, and for at least one month before, plaintiff would not have been competent to perform the job of president of an insurance company on account of the disease of alcoholism, since the job involved complicated discretionary judgments.

Following his resignation and for several years after, appellant received repeated treatments for alcoholism. The defendant acknowledges that alcoholism is regarded by the medical profession as a disease. Plaintiff states that he is no longer drinking, with the inference that he is no longer "incapacitated."

Under the foregoing circumstances, appellant made no application whatever for a pension based on "incapacity" after his resignation. He made no formal request for a disability pension until four years after his severance from the company. Shortly after his resignation he made one informal inquiry of one pension board member on whether he was entitled to a pension, but did not assert that he was "incapacitated" in any way. While the pension board, which was dominated by members of the board of directors, could have granted a disability pension to appellant, *sua sponte*, by "retiring" him, there was no legal compulsion on them to examine employees for disease to determine whether they had become incapacitated. Had plaintiff applied for such a pension in 1968, he would probably have been denied a disability pension. In 1972, when plaintiff first made a formal request for a disability pension, he was informed that his pension rights would not be evaluated until he was age 65.[3] This was, in effect, a denial of his right to "incapacity" benefits. The record does not disclose that appellant offered any evidence to support the claim that he was "incapacitated."

## II

At the close of plaintiff's case, the defendant moved for a directed verdict in its favor. Upon due consideration and over the objection of the plaintiff, the district judge stated that he would hear plaintiff's evidence in rebuttal to the defendant's reliance on the release, prior to deciding the motion.[4] After plaintiff had introduced ev-

3. Plaintiff will be 65 in 1982. This complaint was filed in January 1973.

4. The release form had been introduced into evidence by the plaintiff in his main case. Prior to plaintiff's rebuttal evidence, the release

form was marked and accepted as a defense exhibit. After the rebuttal evidence, one defense witness was heard and cross-examined. There was no abuse of discretion in changing the order of proof so that plaintiff could submit rebuttal evidence prior to the court's ruling on

idence on that point, the district judge granted the defendant's motion on two grounds. He held, first, that plaintiff had failed to sustain his burden of proving that the refusal to grant an "incapacity" pension was arbitrary or otherwise reversible on judicial review. Second, he held that, in any event, plaintiff had failed to sustain the burden of proving the release to be invalid as a waiver of pension rights. Since we affirm the district judge on the first point, we need not consider the defense of release.

### III

■ We have been cited to no case nor have we found one in which addiction to alcohol has been held to be the basis for disability or incapacity benefits under a pension plan. Thus, there is no background of precedent to aid in determining whether the employer intended coverage for such a disease, and whether the employee had a reasonable expectation of recovery if excessive drinking resulted in an involuntary addiction which, in turn, resulted in physical or mental disablement through alcoholism. What analogy there is under the Social Security Act seems to suggest that alcoholism would not have been considered a "physical or mental incapacity" by the parties.[5] In *Hirst v. Gardner*, 365 F.2d 125 (7 Cir. 1966), the government urged that "[i]mpairments resulting from alcoholism or other harmful habits and *curable by abstinence* do not qualify a claimant for social security disability benefits." (Emphasis added). The Seventh Circuit "agree[d] with government counsel." 365 F.2d at 126. In *Lewis v. Celebrezze*, 359 F.2d 398, 400 (4 Cir. 1966), the court recognized that alcoholism can be a disease but held that under the

Social Security Act the claimant must still show "an impairment resulting in permanent disability." The existence of chronic alcoholism is not in itself sufficient to establish such a disability. See *Brasher v. Celebrezze*, 340 F.2d 413 (8 Cir. 1965); *Hays v. Finch*, 306 F.Supp. 115, 118 (W.D.Pa. 1969); *Caffee v. Finch*, 327 F.Supp. 352 (W.D.Ky.1971). But cf. *Badichek v. Secretary of HEW*, 374 F.Supp. 940 (E.D.N.Y. 1974).

■ There seems to be substantial agreement that chronic alcoholism can become a disease with ultimate mental impairment. See *Driver v. Hinnant*, 356 F.2d 761, 763–64 (4 Cir. 1966); *Hays v. Finch, supra*. If the disease progresses to the point where there is recognizable mental or physical deterioration, moral values should not prevent a finding of permanent disability in a proper case despite the etiology of the mental disorder. On the other side of the coin, an addictive disease like alcoholism is in many cases curable, and its mere diagnosis is not synonymous with *permanent* disability or "incapacitation." We entirely accept the view that alcoholism can, for some purposes, be a disabling "disease" which should be treated medically.

■ We turn then to consider what appellant wanted from the pension board and ultimately from the court. The pension plan does not provide for an automatic conferral of benefits upon the existence of incapacity or even upon a finding of incapacity by the pension board. The plan clearly leaves it to the discretion of the pension board (to decide by majority vote) whether to retire the employee from active service. There is no requirement for such a vote. The operative verb is "may be

the directed verdict. Under Fed.R.Civ.P. 50 once the plaintiff's case has been presented, the district court may grant a directed verdict for the defendant at any time. Cf. *Panotex Pipe Line Co. v. Phillips Petroleum Co.*, 457 F.2d 1279 (5 Cir.), *cert. denied*, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 86 (1972).

**5.** The cases discussed in the text arise under 42 U.S.C. § 423, which defines "disability" as meaning "inability to engage in any substantial gainful activity by reason of any medically de-

terminable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" or blindness. 42 U.S.C. § 423(d)(1). Although this statute provides more guidance to the courts in interpreting eligibility for disability social security benefits than does the language of this contract, it is indicative of the likely scope of coverage intended by the shorthand phrase used in the pension plan.

retired."[6] In such cases, the board has the power of decision whether or not to retire the employee. See *Teren v. First National Bank of Chicago*, 243 Or. 251, 412 P.2d 794 (1966).

This apparently boundless discretion provided under the terms of this private, noncontributory plan may be reviewed by the courts, however, as courts have done even where the particular pension plan provided that the decision of the pension board was to be "conclusive," see *Smith v. New England Telephone & Telegraph Co.*, 109 N.H. 172, 246 A.2d 697 (1968); *Menke v. Thompson*, 140 F.2d 786, 791–92 (8 Cir. 1944), or that the trustees had "full authority" to determine eligibility. See *Forrish v. Kennedy*, 377 Pa. 370, 105 A.2d 67 (1954). But when the courts review these discretionary or "conclusive decisions" of a pension board, the standards of review are relatively narrow. The burden is on the plaintiff to show that the board's ruling was motivated by bad faith or fraud or the result of arbitrary action. *Bradford v. New York Times Co.*, 501 F.2d 51, 61 (2 Cir. 1974); *Golden v. Kentile Floors, Inc.*, 512 F.2d 838, 847 (5 Cir. 1975); *Menke v. Thompson, supra.* See *Gitelson v. DuPont*, 17 N.Y.2d 46, 49, 268 N.Y.S.2d 11, 215 N.E.2d 336 (1966); *Bruner v. Mercantile National Bank*, 455 S.W.2d 323, 328 (Tex. Civ.App.1970); *Amicone v. Kennecott Copper Corp.*, 19 Utah 2d 297, 431 P.2d 130 (1967).

In the present case, appellant gave the pension board no opportunity to consider his medical condition at the time of his severance. In light of the lack of precedent treating heavy drinking as chronic alcoholism and chronic alcoholism as necessarily having reached the stage of "incapacitation," the pension board is hardly at fault for not taking the initiative. That is particularly so since appellant was apparently still voicing his belief in his own competence.

The testimony of the doctors in this action shows, at best, a very recent chronic alcoholism, the onset of which occurred within a few months of severance, the most acute symptoms coming during the last month of employment after appellant had already agreed to resign. Even if the formal demand on the board, four-and-a-half years after severance, still required it to vote on whether to "retire" appellant, there was no showing that the available evidence was such as to *require* the board to find a permanent disability.[7]

Where the pension board has failed to act because the claimant, or someone on his behalf, has not asked it to do so, we think that the scope of review is no less limited than if it had been asked and refused. It would seem implicit that some request must be made by a claimant, and that if the request is not made the disability benefit does not vest. See *Weber v. Bell Telephone Co.*, 415 Pa. 292, 203 A.2d 554 (1964). If the board could have fairly decided against appellant upon the evidence ultimately presented before the court, that would be the end of it in the absence of proof of bad faith or fraud. See *Matthews v. Swift & Co.*, 465 F.2d 814, 821 (5 Cir. 1972); *Hainline v. General Motors Corp.*, 444 F.2d 1250, 1255 (6 Cir. 1971); *Siegel v. First Pennsylvania Banking & Trust Co.*, 201 F.Supp. 664 (E.D.Pa.1961), 248 F.Supp. 249 (E.D.Pa. 1965).

We are thus led to the conclusion that the standard for a directed verdict was not whether the plaintiff had proved disability by a preponderance of the evidence but whether he had met the more difficult standards enunciated in the cited authorities. We conclude that Judge Blumenfeld adopted the proper test for his decision to direct the verdict for the defendant.

---

**6.** By contrast, the plan provided that at age 65 employees "shall be" retired.

**7.** The record fails to disclose that any probative medical evidence was presented in the formal claim. We assume that "retirement" coincides with a condition of *permanent* disability. We note that the pension plan excludes "leave of absence" and "temporary absences due to ill health" in its definition of years of service requirements, implying that less than permanent incapacitation is not within the purview of the provisions for early retirement.

As Judge Blumenfeld noted in his discussion on the motion for a directed verdict, heavy drinking may be sufficient to justify dismissal on grounds of incompetence without amounting to the kind of "physical or mental incapacitation" envisioned by the terms of the pension plan. Such provisions are generally intended to provide monetary relief to persons forced to retire early due to permanent physical or mental incapacities. Plaintiff introduced no evidence to show the permanence of any temporary incapacity induced by his drinking problem. Indeed, his own medical witness testified that plaintiff's problem was fully treatable; and plaintiff by his own testimony is no longer drinking.

Moreover, plaintiff's burden was not merely to show actual incapacitation but also to show that the pension board could have reached no other conclusion without being arbitrary, fraudulent or in bad faith. In view of plaintiff's own admissions, he has clearly not adduced sufficient evidence from which the jury could draw the conclusion required to entitle him to relief. Plaintiff maintained on the witness stand at trial that he had been able to carry out his duties right up to the time of his resignation. This evidence alone would justify the pension board in not acting to "retire" appellant on a disability pension. The testimony is undisputed that appellant went to work every day, conducted stockholders' meetings, and attended all board of directors' meetings. No doctor at any time, much less prior to his resignation, advised him to stop work on account of his mental or physical condition. These circumstances preclude a finding that the pension board's action was arbitrary.

Appellant argues, however, that the standard for review accepted by Judge Blumenfeld is not in accordance with Connecti-cut law.[8] We disagree. In *Bird v. Connecticut Power Co.,* 144 Conn. 456, 133 A.2d 894 (1957), the court found that the supervening cause of plaintiff's voluntary resignation was the disclosure of his embezzlement from the company. The court did not reach the question of the proper standard for review of denials of pensions where incapacitation is claimed. The district court here held, as did the court in *Bird,* that a pension plan creates contractual rights and that court review may not be defeated through reservation of discretionary power in the pension board.[9] The Connecticut court gave no intimation that it would apply a standard of review other than that adopted by the district court. Indeed, the *Bird* court cited with approval authorities we have noted in this opinion. See, e. g., *Menke v. Thompson, supra; Forrish v. Kentucky, supra.* On the facts in its case, the *Bird* court affirmed a directed verdict for the defendant.

Plaintiff does assert a claim of bad faith in the action of the company. We find a lack of evidence to support the assertion. Plaintiff by his own admission had decided to resign in April, a month before he signed the release. Since appellant has not sustained his burden of showing that he was entitled to a pension on account of physical or mental incapacitation, whether or not there was a valid release, we need not rule on the correctness of this alternate ground for the district court's holding.

The judgment of the district court is affirmed.

**8.** The parties agree that there is no applicable Rhode Island law on this question. Judge Blumenfeld applied the review standard of New York law as enunciated by the Fifth Circuit in *Matthews v. Swift & Co.,* 465 F.2d 814, 821 (5 Cir. 1972).

**9.** Later Connecticut opinions citing *Bird* treat it only as establishing that informal pension plans give rise to contractual rights which cannot be defeated by assertion of discretionary power, and we agree. See *Borden v. Skinner Chuck Co.,* 21 Conn.Super. 184, 150 A.2d 607, 610 (1958); *Ellis v. Emhart Mfg. Co.,* 150 Conn. 501, 191 A.2d 546, 549 (1963).