Ralph John MILLER, Appellant,

v.

ASSOCIATED PENSION TRUSTS,
INC. et al., Appellees.

No. 75–1696.

United States Court of Appeals,
Eighth Circuit.

Submitted May 11, 1976.
Decided Sept. 2, 1976.

Joe W. Case, Manchester, Mo., for appellant.

Thomas C. Walsh, St. Louis, Mo., for appellees.

Before BRIGHT, STEPHENSON and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

When Ralph John Miller was discharged from his employment, he went to work for a competitor and promptly attracted business away from his former employer. This resulted in a forfeiture of his interest in the company profit sharing trust in which he had accumulated substantial credit. When his former employer failed to provide notice and a hearing as provided in the indenture of trust, Miller brought this diversity action to recover actual and punitive damages and for an accounting against defendants Plastic Molders Supply Company and PMS Company of Illinois, Inc.;[1] William Brad-

1. Plastic Molders Supply Company and PMS Company of Illinois are wholly-owned subsidiaries of PMS Consolidated; for convenience, the three companies will be referred to collectively as "PMS" unless otherwise indicated.

bury and Richard Bradbury, as officers of PMS and trustees of Plastic Molders Profit Sharing Trust; and Associated Pension Trusts, Inc., and its president, John Lindgren. Following a trial to the court, the District Court[2] entered judgment in favor of defendants. We affirm.

In his appeal, Miller makes no claim that his conduct in entering into employment with a competitor of his former employer did not constitute a basis for forfeiture of his benefits under the profit sharing trust; likewise, he does not deny that he entered upon such employment with knowledge that his conduct would be a basis for such forfeiture. Rather, he contends that the District Court erred in upholding the forfeiture because the conditions precedent to forfeiture had not been observed. He also alleges that the trustees of the profit sharing trust acted in bad faith because of their personal interest in the forfeited funds. It is upon these narrow issues that we review this appeal.

PMS is a family-owned company founded in 1951 by its current president, William Bradbury. It is engaged in the business of manufacturing and selling plastic colorants. In 1960, PMS established a "Plastic Molders Profit Sharing Trust" (the Plan), designed to encourage loyalty among its employees and to provide generous retirement benefits. Funding was undertaken solely by the several PMS companies, based upon the salaries of the various participants and the profitability of the respective companies in each given fiscal year. There was no employee contribution to the Plan at any time. The governing indenture of the Plan provided in relevant part that:

(c) If the Trustees find that any separated participant, during the first twelve (12) months after his separation, is engaged directly or indirectly in conduct prejudicial to the Company's interests,

and if, after due notice such separated participant continues to be so engaged, the Trustees shall terminate payment of any further separation benefits to such separated participant * * * and any remaining balance shall be forfeited.

* * * * * *

(e) In the event a participant is charged with forfeiture of all benefits, the Company shall be called upon to produce affirmative evidence to completely prove such charge beyond any doubt whatsoever. The participant so charged shall be afforded the right to be heard, and to produce witness to deny such charge. The Trustees' decision shall be final.

Shortly after the Plan was established, a booklet was prepared that described the operation and essential features of the Plan. Miller received a copy when he joined PMS, as did each other employee. The booklet included the following statement:

There will be no benefits paid under this plan to any employee who goes to work for a competitor of this firm or opens his own business in competition with this firm. If any employee does this, the entire amount of money vested in his account will revert back to the remaining participants.[3]

Miller began employment with PMS in May, 1965, serving as a salesman in the Saint Louis district, which covered eastern Missouri, southern Illinois, southern Iowa, southern Indiana, and western Kentucky and was later expanded to include western Missouri and Kansas. Within four years Miller became manager of the Saint Louis district. As district manager, he was responsible for all company operations in the district, including production and sales.

In November, 1971, PMS became dissatisfied with Miller's performance and in-

2. The Honorable H. Kenneth Wangelin, United States District Court for the Eastern District of Missouri.

3. Miller admitted, and the District Court specifically found, that he had knowledge of this restriction prior to termination of his employment with PMS and that he was aware of the consequences that would result from taking employment with a competitor of PMS.

formed him that his employment had been terminated. Upon his request for a second chance, Miller was reinstated, but his performance continued to be unsatisfactory to PMS. In May, 1972, William Bradbury received information from employees of the Saint Louis production plant that they would quit if Miller was not fired. Bradbury went to Saint Louis to investigate the situation and, on May 17, 1972, wrote a letter to Miller terminating his employment with PMS effective immediately. Miller continued to be paid through June 22, 1972, however, at which time he was given one month's termination pay.

In early July, 1972, after his termination at PMS, Miller accepted employment with Hammond Plastics Company as the exclusive sales representative for the introduction of their product line in their Midwest Territory, which was virtually coextensive with the PMS Saint Louis District. Hammond sells plastic raw materials, including plastic colorants, and had not been previously represented in that geographic area. In July, 1972, and thereafter, Miller called on customers of PMS and solicited them to buy Hammond products, including colorants, that were used for the same purposes and accomplished essentially the same results as PMS products. Approximately seventy-five percent of the accounts called on by Miller during the first five months of his employment with Hammond were customers of PMS, and PMS lost business to Hammond in the territory in question as a result of Miller's sales activities.

On July 3, 1972, Miller, on advice of an attorney, inquired of PMS whether he could examine the Plan's indenture. Both Miller and his attorney were advised by mail that they could examine the indenture at the PMS Illinois office.

In August or September, 1972, William Bradbury, who was also a co-trustee of the profit sharing trust, became aware of rumors that Miller had taken employment with a competitor of PMS. He requested the company, through Glen Skov, the Illinois manager of PMS, to obtain verification of these rumors. Skov secured and supplied to Bradbury one of Miller's business cards showing his employment with Hammond. Bradbury also learned that Miller was representing Hammond in almost precisely the same geographical area he had covered for PMS. Bradbury then conferred with his co-trustee and son, Richard Bradbury, regarding the status of Miller's benefits under the Plan. The District Court found that the trustees were convinced beyond any doubt that Miller was engaged in conduct prejudicial to the company's interest. They accordingly determined that Miller was not entitled to any benefits under the plan.[4]

In January, 1973, PMS received an inquiry from Miller's attorney regarding the availability of benefits under the Plan. PMS advised the attorney that Miller was not eligible for benefits under the Plan because of his competitive employment with Hammond. Neither PMS nor the trustees received any immediate response to that notification.

Miller again requested payment of his share under the Plan on July 11, 1973, by a personal letter to Associated Pension Trusts, the actuarial consultant to the Plan. At that time he was again notified that he was disqualified because he had been employed by Hammond. There was no further response from Miller until mid-November of 1973, when his attorney sent letters to the trustees and to the Associated Pension Trusts requesting a hearing. A hearing on the termination of Miller's benefits has never been held.

■ Judicial review of the acts of trustees in administrating a noncontributory profit sharing or pension plan is limited to a determination of whether the trustees have

---

4. According to the terms of the indenture, the funds in Miller's account would, if forfeited, be redistributed among the remaining participants employed by PMS Company of Illinois, which was Miller's immediate employer. The District Court found that neither of the trustees was employed by PMS Company of Illinois at the time of the termination and that neither of them would thus share in a reallocation of trust benefits forfeited by Miller.

acted arbitrarily, capriciously, or in bad faith. *Wyper v. Providence Washington Insurance Co.,* 533 F.2d 57, 62 (2d Cir. 1976); *Maness v. Williams,* 513 F.2d 1264, 1265 (8th Cir. 1975); *Golden v. Kentile Floors, Inc.,* 512 F.2d 838, 847 (5th Cir. 1975). Miller asserts that the following conduct of the trustees demonstrates their lack of good faith in administration of the Plan: (1) the failure of the trustees to give notice to Miller that his continued employment with Hammond would result in forfeiture of benefits; (2) the failure of the trustees to conduct a hearing prior to the termination of benefits; and (3) the conflict of interest resulting from William Bradbury, the primary PMS officer, shareholder, and trust participant, performing as one of two trustees.

Miller does not contend that the District Court erred in finding that his employment with Hammond breached a condition of the Plan; indeed, the entire action has been prosecuted with Miller expressly admitting that he knowingly engaged in conduct that disqualified him from participation in the Plan. The notice and hearing provisions of the Plan were clearly intended to protect (1) a former employee who inadvertently engages in activities that could result in forfeiture and who would cease such activities upon proper notice, and (2) a former employee who does not in fact engage in such activities. Since Miller concedes his activities were knowingly entered into and makes no claim that he would have ceased to engage in them upon formal notice from the trustees, there has been no showing of prejudice from the failure of the trustees to provide formal notice and hearing that would compel a finding of arbitrary or capricious conduct, or conduct amounting to bad faith.[5] *See Van Pelt v. Berefco, Inc.,* 60 Ill.App.2d 415, 208 N.E.2d 858, 865 (1965). *Cf. Wyper v. Providence*

*Washington Insurance Co., supra,* 533 F.2d at 62; *Golden v. Kentile Floors, Inc., supra,* 512 F.2d at 847–49; *Clark v. New England Telephone & Telegraph,* 229 Mass. 1, 118 N.E. 348, 351 (1918).

Our affirmance does not reflect approval of the failure of the trustees to follow the prescribed procedures in effecting the forfeiture. Forfeitures are disfavored under New Jersey law, which is applicable here. *See Stopford v. Boonton Molding Co.,* 56 N.J. 169, 265 A.2d 657, 665 (1970); *Russell v. Princeton Laboratories, Inc.,* 50 N.J. 30, 231 A.2d 800, 803 (1967). The trust was administered by two officers, who were also major stockholders, in what had the appearance of a cozy arrangement. There was substantial evidence to support the finding of the District Court that the forfeiture did not benefit any of the individual defendants in the case, and the District Court's rejection of the conspiracy claim was not clearly erroneous. Every employer should avoid the appearance of impropriety by carefully observing the procedural safeguards that have been established to protect employee participants from unjustified forfeiture of earned interests in their profit sharing plan. In this case Miller was not clearly prejudiced; he entered into competition with PMS with full awareness of the likely consequences and has since that time alleged no wish to curtail such activities. He makes no challenge on appeal to the validity of the forfeiture clause itself or its applicability to this case. For these reasons, we affirm.[6]

---

5. *See note 4, supra.*

6. In view of our resolution of the case, we need not address Miller's additional contentions that: (1) the District Court erred in its finding of the date of his discharge from employment; and (2) the District Court erroneously denied

him the opportunity to advise it on certain issues of law after previously stating that such an opportunity would be available. The claim for accounting must also fail because Miller has failed to show any remaining interest in the profit sharing fund.