In re FIDELITY AMERICAN MORT-
GAGE COMPANY, a Pennsylvania
Corporation, Debtor.

In re WHISPERING BROOK
ASSOCIATES, Debtor.

FIRST NATIONAL BANK OF
LOUISVILLE, Plaintiff,

v.

FIDELITY AMERICAN MORTGAGE
COMPANY, a Pennsylvania Corpora-
tion, and Whispering Brook Associates,
and Norman M. Kranzdorf, Trustee, De-
fendants.

Bankruptcy Nos. 81–00386G, 81–00394G.
Adv. Nos. 81–1176G, 81–1177G.

United States Bankruptcy Court,
E. D. Pennsylvania.

April 23, 1982.

Jack B. Justice, Joseph A. Dworetzky, Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff, First Nat. Bank of Louisville.

Charles M. Golden, Barsky, Golden & Remick, Philadelphia, Pa., for debtors, Fidelity American Mortg. Corp. and Whispering Brook Associates.

Michael L. Temin, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Howard I. Green.

Norman M. Kranzdorf, trustee/defendant.

Alexander N. Rubin, Jr., Fell, Spalding, Goff & Rubin, Philadelphia, Pa., for trustee, Norman M. Kranzdorf.

Neal D. Colton, Dechert, Price & Rhoads, Philadelphia, Pa., for the secured mortgage noteholders in FAMCO.

Edward C. Toole, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa. and Lawrence R. Scheetz, Williams & Scheetz, Richboro, Pa., Co-counsel for creditors' committee in FAMCO.

Elizabeth K. Heize, Drexel Hill, Pa., Chairperson, unsecured creditors' committee in FAMCO.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issue presented herein is whether the automatic stay provisions of § 362(a) of the Bankruptcy Code ("the Code") are applicable to prevent a mortgagee from foreclosing on its mortgage on an apartment complex. We conclude that the automatic stay provisions are inapplicable in this case because the debtors lost all interest in the subject property prior to the time they filed their petitions under chapter 11 of the Code.

The facts of the instant case are as follows:[1] On February 4, 1981, Fidelity America Mortgage Company, a Pennsylvania corporation ("FAMCO") and Whispering Brook Associates ("WBA") filed petitions for reorganization under chapter 11 of the Code. WBA is a Kentucky limited partnership of which FAMCO is the general partner. On September 4, 1981, the First National Bank of Louisville ("the bank") commenced separate adversary actions against FAMCO and WBA which were subsequently consolidated.[2] In those actions, the bank sought a determination that the automatic stay provisions of the Code are inapplicable to the realty and improvements known as the Whispering Book Apartments,[3] and located in Louisville, Kentucky. In the alternative, the bank requested a modification of the stay to permit it to proceed with its foreclosure action against that property. The bank's complaint is based on the rather complicated financial transactions involving the Whispering Brook Apartments which we hereafter summarize.

On December 30, 1976, the bank made a loan to W. B. Associates[4] which was secured by a mortgage on the land and improvements comprising the Whispering Brook Apartments.[5] On May 1, 1979, W. B. Associates leased the underlying land and sold the improvements to Two R's Company ("TRC").[6] As part of that transaction, TRC executed a promissory note payable to W. B. Associates.[7] The deed and a memoran-

---

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

2. On September 16, 1981, we appointed Norman Kranzdorf, as trustee of FAMCO and certain other related debtors. Thereafter, the trustee appeared and filed answers to the above complaints.

3. The Whispering Brook Apartments are (or were) also known as the Mountain View Apartments.

4. W. B. Associates is distinct from and unaffiliated with either WBA or FAMCO and is not a debtor in these proceedings.

5. *See* Exh. P–4 and P–5.

6. *See* Exh. P–9 and P–10.

7. *See* Exh. P–11.

dum of lease with respect to the land lease agreement were both properly recorded.[8]

At about the same time TRC sold the improvements of the Whispering Brook Apartments to WBA by a bill of sale (although no deed therefor was executed or recorded).[9] As part of that transaction, WBA executed a wraparound mortgage in favor of TRC who thereupon assigned it to FAMCO.[10]

Beginning in May, 1980, TRC defaulted in its payments to W. B. Associates under the note. As a result, TRC and W. B. Associates entered into negotiations which apparently resulted in an agreement to modify the terms of the note, which agreement was conditioned on the execution of certain documents and the delivery of those documents to an escrow agent.[11] TRC failed, however, to comply with the agreement.[12] Consequently, on November 26, 1980, W. B. Associates sent a notice of default under the land lease agreement and demanded that the default be cured.[13] When TRC failed to cure the default, W. B. Associates notified TRC by certified mail on January 21, 1981, that it was declaring the land lease agreement and sale of the improvements to be terminated.[14]

When TRC did not vacate the property, W. B. Associates instituted two actions in the state courts in Jefferson County, Kentucky. The first was against TRC, WBA and FAMCO and sought an order enforcing the terms of the land lease agreement.[15] The second action was a petition for a writ of forcible detainer against TRC and WBA to obtain possession of the property.[16] On January 29, 1981, a judge of the Jefferson County Circuit Court entered a consent order in the first action, appointing a receiver to manage the Whispering Brook Apartments.[17]

It was after the occurrence of all of the above that FAMCO and WBA filed their respective petitions for reorganization under chapter 11 of the Code. In the interim, W. B. Associates had defaulted on the bank's mortgage by failing to make the required payments thereunder[18] whereupon the bank sought to foreclose on the property. However, because it was uncertain whether the automatic stay provisions of the Code were applicable in light of the notices of default and termination, the bank filed the instant adversary proceedings seeking a determination of that issue.

The case at bench involves an interpretation of § 362(a) of the Code which provides an automatic stay, *inter alia*, of acts to enforce a lien against or to obtain possession of property of the debtor or of the estate.[19] Property of the estate is defined

---

8. *See* Exh. P–10 and N.T. at 42 (Nov. 24, 1981).

9. *See* Exh. P–20. Although the trustee asserted that TRC also leased the underlying land to WBA, no executed copy of that lease was introduced into evidence. *See* N.T. at 27–29 (Dec. 11, 1981).

10. *See* N.T. at 42 (Nov. 24, 1981).

11. *See* Exh. P–23, P–24, P–30, P–32 through P–37.

12. *See* Exh. P–37 and P–38.

13. *See* Exh. P–12 and P–27. *See also*, Exh. P–8 (return receipts dated Dec. 3, 1980).

14. *See* Exh. P–13, P–14, P–28 and P–29.

15. *See* Exh. P–16.

16. *See* Exh. T–2.

17. *See* Exh. P–16.

18. *See* Exh. P–6 and N.T. at 22–31 (Nov. 24, 1981).

19. Section 362(a) provides in relevant part:

    (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of—

    .  .  .  .  .

    (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
    (3) any act to obtain possession of property of the estate or of property from the estate;
    (4) any act to create, perfect, or enforce any lien against property of the estate;
    (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title.

in § 541(a) of the Code to include all legal or equitable interests that the debtor had in any property as of the commencement of the case.[20] The bank argues that, prior to the filing of the petitions by WBA and FAMCO, the debtors had lost all interest in the land and the improvements by virtue of the declarations of default and termination by W. B. Associates and that, consequently, the automatic stay was inapplicable.[21] Thus, the pivotal questions herein are: (1) whether the land lease agreement was, in fact, terminated pursuant to state law prior to the filings under chapter 11 by WBA and FAMCO and (2) if so, whether that termination and the appointment of a receiver for the property eliminated all of WBA's and FAMCO's interests in the land and improvements comprising the Whispering Brook Apartments.

Generally, forfeiture clauses are not favored in law or equity.[22] When interpreting such clauses, the Kentucky courts have been reluctant to enforce those clauses and have, consequently, strictly construed them against the party who claims the right of forfeiture.[23] If a lease expressly provides for forfeiture, however, the Kentucky courts have held that the lessor may terminate the lease in accordance with the contract provisions[24] without the assistance of judicial process.[25]

In the instant case, the express terms of the land lease agreement clearly provide for the forfeiture of the said agreement and the sale of the improvements, which right W. B. Associates properly exercised in accordance with the terms of that agreement. In this regard, § 20 of the land lease agreement provides that the failure to make payments to W. B. Associates under the note constitutes a default.[26] Section 20 further provides that, on such a default, W. B. Associates has the right to "declare this lease and tenancy hereby created terminated."[27] In addition, § 7 of the land lease agreement provides that, upon termination of that agreement, the "title to all Improvements . . . shall vest in Landlord [W. B. Associates] . . . and Tenant will surrender possession of the Premises to Landlord, to-

---

11 U.S.C. § 362(a).

**20.** Section 541(a) provides in part:
  (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located:
  (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
11 U.S.C. § 541(a). .

**21.** In the alternative, the bank contended that WBA never acquired *any* interest in the property in question. With respect to the underlying land, the bank points to the fact that no executed land lease was produced by the trustee to support his contention that WBA had obtained a leasehold interest in the land. *See* note 9 *supra.* With respect to the improvements, the bank asserts that a deed was necessary to convey an interest therein rather than merely the bill of sale which TRC and WBA used. *See* Ky.Rev.Stat.Ann. § 382.010 (Baldwin 1981). In light of our decision herein that WBA and FAMCO lost whatever interest they had in the land and improvements when TRC lost its interests therein by virtue of the notice of termination given by W. B. Associates on January 21, 1981, we find it unnecessary to resolve the issue of whether WBA ever obtained any interest in the property.

**22.** *See, e.g., Miller v. Associated Pension Trusts, Inc.,* 541 F.2d 726, 729 (8th Cir. 1976); *Howard v. Federal Crop Ins. Corp.,* 540 F.2d 695, 697 (4th Cir. 1976); *Courson v. Maryland Casualty Co.,* 475 F.2d 1030, 1033 (8th Cir. 1973).

**23.** *See, e.g., Miller Dairy Prod. Co. v. Puryear,* 310 S.W.2d 518, 521 (Ky.1957); *Schwartz Amusement Co. v. I. O. O. F.,* 278 Ky. 563, 568, 128 S.W.2d 965 (Ky.1939).

**24.** *See, e.g., Miller Dairy Prod. Co. v. Puryear,* 310 S.W.2d 518, 521 (Ky.1957); *Schwartz Amusement Co. v. I. O. O. F.,* 279 Ky. 563, 568, 128 S.W.2d 965 (Ky.1939). *Cf. Adams v. Shoopman,* 316 S.W.2d 840 (Ky.1958); *Estes v. Gatliff,* 291 Ky. 93, 98, 163 S.W.2d 273 (Ky. 1942).

**25.** Although a landlord *may* bring an action to evict a tenant who refuses to surrender possession, such an action is not a prerequisite to an effective lease termination. Ky.Rev.Stat.Ann. § 383.210 (Baldwin 1981). *See, e.g., Stoll Oil Ref. Co. v. Pierce,* 337 S.W.2d 263 (Ky.1960).

**26.** *See* Exh. P–9, § 20.1(f).

**27.** *Id.* at § 20.

gether with all Improvements thereon."[28] Therefore, we conclude that, on TRC's default in payments on the note, W. B. Associates had the right under the land lease agreement to terminate both the land lease agreement and the sale of the improvements. Finally, we conclude that W. B. Associates properly exercised that right of termination by mailing a notice of termination by certified mail to TRC.[29] Furthermore, we conclude that that termination occurred prior to the date WBA and FAMCO filed petitions under the Code because § 32 of the land lease agreement provides that termination of that agreement is effective as of the date when notice thereof is sent by certified mail,[30] which in this case was on January 21, 1981, fourteen days before the petitions were filed.

The trustee asserts, however, that the land lease agreement was not terminated for several reasons. First, the trustee contends that the conciliatory conduct displayed by W. B. Associates prior to sending the termination letter negates a finding that W. B. Associates intended to terminate the land lease agreement. We disagree. Although W. B. Associates did enter into negotiations and a further agreement with TRC after the default under the land lease agreement, TRC also defaulted on the supplementary agreement whereupon W. B. Associates eventually exercised its right to send a demand letter and, subsequently, a termination notice. Furthermore, the language of the termination notice[31] and the

actions taken by W. B. Associates to obtain possession of the property thereafter[32] clearly support a finding that W. B. Associates intended to terminate and did, in fact, terminate the land lease agreement and the sale of the improvements.

The trustee next argues that W. B. Associates and TRC intended the land lease agreement to be a *sale* of the underlying land rather than merely a lease and that, consequently, more was needed to terminate TRC's interest in the land. We find this argument to be unpersuasive. The instrument itself is designated a leasehold agreement and the language throughout that instrument is characteristic of a commercial lease agreement rather than a purchase agreement.[33] Although the land lease agreement did contain an option to purchase the land, that alone does not convert a lease agreement into a purchase agreement.[34] In this regard, we note that the purchase price under the option to purchase was not merely a nominal sum.[35] Finally, since the option to purchase was only available to TRC during the term of the lease,[36] we conclude that TRC has lost the right to exercise that option because of the termination of the land lease agreement.

The trustee also asserts that judicial process was necessary under Kentucky law to divest TRC of record title to the improvements. Thus, the trustee contends that, since the state court actions by W. B. Associates were not completed before WBA

28. *Id.* at § 7.

29. *Id.* at § 32. *See also*, Exh. P 13, P 14, P 28 and P 29.

30. *See* Exh. P 9, § 32.

31. *See* Exh. P 13, P 14, P 28 and P–29.

32. *See* notes 16 and 17 and accompanying text, *supra.*

33. *See* Exh. P 9.

34. *Cf. Arkansas Bank and Trust Co. v. United States*, 224 F.Supp. 171 (W.D.Ark.1963) (for federal income tax purposes, the determination of whether a lease is really a sale depends on numerous factors, including whether the lease contains an option to purchase). *See generally*, Rev.Rul. 55-540, 1955-2 Com.Bull. 39. *See also, In re Vaillancourt*, 7 U.C.C.Rep.Serv. 748 (Bkrtcy.D.Me.1970) (Callaghan) (under U.C.C. § 1–201(37)(b) there arises an irrebuttable presumption that a lease of personal property is really a sale where that lease contains an option to purchase for no or nominal consideration). *See also, RCA Corp. v. State Tax Commission*, 15 U.C.C.Rep.Serv. 487 (Mo.S.Ct.1974) (Callaghan).

35. *See* Exh. P–9 at § 30.1 (purchase price under option is $500,000). *Cf. In re Vaillancourt*, 7 U.C.C.Rep.Serv. 748 (Bkrtcy.D.Me.1970) (Callaghan).

36. *Id.* at § 30.4.

and FAMCO filed their petitions,[37] TRC and the debtors retained an interest in the improvements even after the land lease agreement was terminated. We are unpersuaded by this argument. By the express terms of the land lease agreement, which was incorporated in the deed conveying the improvements, W. B. Associates had the right to terminate the land lease and the sale of the improvements simply by sending a notice of termination.[38] As we stated above, such an express forfeiture provision, although not favored, will be enforced by the Kentucky courts.[39] Furthermore, although W. B. Associates did institute an action in the state courts requesting an order directing the commissioner of the court to execute a deed of reconveyance of the improvements, that action appears to have been optional. The statute under which W. B. Associates was proceeding provides only that such an order of reconveyance *may* be sought.[40] The trustee has cited no statute or case under Kentucky law which would require W. B. Associates to obtain an order of the state courts before the title to the improvements could revest in it. Consequently, we conclude that title to the improvements revested in W. B. Associates pursuant to the terms of the land lease agreement without the necessity of judicial action.[41]

The second question presented in this case is whether WBA and FAMCO retained any interest, legal or equitable, in the Whispering Brook Apartments at the time they filed their petitions for reorganization under the Code. As we stated above, we find that, by the terms of the land lease agreement, TRC (and, thus, its assignees, WBA and FAMCO) lost all interest in the underlying land and the improvements on January 21, 1981, when W. B. Associates sent the termination notice.[42] Furthermore, TRC, WBA and FAMCO lost even their possessory interests in the property when a receiver was appointed by the state court on January 29, 1981.[43] Thus, WBA and FAMCO lost even the "scintilla of equitable interest" which is represented by mere possession of property.[44]

The trustee contends, however, that we should consider the equities of the instant case—namely, that the property in question is important to the successful reorganization of the debtors—and thus deny the relief requested by the bank. Although such considerations are important in determining whether relief from the automatic stay should be granted,[45] we conclude that they are irrelevant in determining whether the debtors have any interest in the property so that the protection of the automatic stay is available. Where the debtor has lost all interest in the property prior to the filing of a petition under the Code, we conclude that we should not rely on equitable considerations to revive the debtor's interest and to make the automatic stay provisions applicable. In two cases with facts similar to the instant case (except that the debtors were still in possession of the property), the bankruptcy courts held that, where a lease was terminated prior to the

---

37. *See* Exh. P–16 and T–2.

38. *See* Exh. P–9 at § 7, § 20 and § 32.

39. *See* notes 23–25 and accompanying text, *supra*.

40. That statute provides, in relevant part:
    (1) Real property *may* be conveyed by a commissioner appointed by the court:
    (a) If by the judgment in an action a party be ordered to convey such property to another.
    Ky.Rev.Stat.Ann. § 426.571 (Baldwin 1981). (emphasis added).

41. *See* Exh. P–9 and notes 26–30 and accompanying text, *supra*.

42. *See* notes 26–30 and accompanying text, *supra*.

43. *See* note 17 and accompanying text, *supra*.

44. *In re Mimi's of Atlanta, Inc.*, 5 B.R. 623, 627, 6 B.C.D. 807, 2 C.B.C.2d 805 (Bkrtcy.N.D.Ga. 1981). *See also, In re Lewis*, 15 B.R. 643 (Bkrtcy.E.D.Pa.1981); *In re Acorn Investments*, 8 B.R. 506, 7 B.C.D. 135 (Bkrtcy.S.D.Cal.1981); *In re R. R. S., Inc.*, 7 B.R. 870 (Bkrtcy.M.D.Fla. 1980); *In re Andorra Meat Market, Inc.*, 7 B.R. 744 (Bkrtcy.E.D.Pa.1980); *In re GSVC Restaurant Corp.*, 3 B.R. 491, 6 B.C.D. 134 (Bkrtcy.S. D.N.Y.), *aff'd*, 10 B.R. 300 (D.C.S.D.N.Y.1980).

45. *See* 11 U.S.C. § 362(d)(2)(B).

filing of the debtor's petition, equitable considerations did not prevent the court from granting relief from the stay. *See, e.g., In re Chuck Wagon Bar-B-Que, Inc.,* 7 B.R. 92, 6 B.C.D. 1280 (Bkrtcy.D.D.C.1980); *In re Hospitality Associates, Inc.,* 6 B.R. 778, 6 B.C.D. 1142 (Bkrtcy.D.Or.1980). In *Chuck Wagon,* the court stated:

> There clearly must come a point in time when the parties to a lease are entitled to legitimate expectation of finality in connection with their business dealings. It is clearly inequitable to permit a debtor to attempt to cure and remedy a contractual obligation that has already expired. To permit a debtor to assert rights under an already expired lease by resort to the equitable provisions of the Bankruptcy Code would undermine confidence not only in the certitude of contracts, but in the judicial system itself.

7 B.R. at 95. The court in *Chuck Wagon* further stated that the debtor also did not have the right to revive or cure the expired lease under § 365 of the Code which only gives a debtor or trustee the right to assume an unexpired lease.[46]

The cases which the trustee cites, in support of his contention that equity may permit the debtors to revive their interests in the subject property, are distinguishable from the instant case. In *In re Fontainebleau Hotel Corporation,*[47] the United States Court of Appeals for the Fifth Circuit held that it was within the equitable power of the court to refuse to declare a forfeiture of a lease. However, in that case, the court was relying on Louisiana law which required judicial intervention to terminate a lease.[48] No such law exists in Kentucky.

Likewise, the trustee's reliance on *Crawford v. Braden*[49] is misplaced. In that case the Kentucky Court of Appeals refused to enforce a forfeiture clause in a lease at the request of the lessor because it found that the parties had intended that clause to be for the benefit of the lessee, not the lessor.[50] In the instant case, we find that the termination provisions of the land lease agreement were for the benefit of W. B. Associates, the lessor, rather than for the benefit of TRC, the lessee.

Consequently, we conclude that there is no authority under the Code, Kentucky law or equitable considerations which would allow us to revive the interests of WBA and FAMCO in the Whispering Brook Apartments. Therefore, since we have found that WBA and FAMCO lost all interest in the property prior to the filing of their respective petitions for reorganization under the Code, we conclude that the automatic stay provisions of § 362(a) of the Code are inapplicable to the property. As a result, the bank is not prevented from continuing with its mortgage foreclosure action against the property.

**46.** *Accord, In re GSVC Restaurant Corp.,* 10 B.R. 300 (Bkrtcy.S.D.N.Y.1980), *aff'g,* 3 B.R. 491, 6 B.C.D. 134 (Bkrtcy.S.D.N.Y.1980); *In re Victory Pipe Craftsmen, Inc.,* 8 B.R. 635 (Bkrtcy.N.D.Ill.1981); *In re Acorn Investments,* 8 B.R. 506, 7 B.C.D. 135 (Bkrtcy.S.D.Cal.1981); *In re R. R. S., Inc.,* 7 B.R. 870 (Bkrtcy.M.D.Fla. 1980); *In re Andorra Meat Market, Inc.,* 7 B.R. 744 (Bkrtcy.E.D.Pa.1980); *In re Chuck Wagon Bar-B-Que, Inc.,* 7 B.R. 92, 6 B.C.D. 1280 (Bkrtcy.D.D.C.1980); *In re Hospitality Associates, Inc.,* 6 B.R. 778, 6 B.C.D. 1142 (Bkrtcy.D. Or.1980); *In re Mimi's of Atlanta, Inc.,* 5 B.R. 623, 6 B.C.D. 807, 2 C.B.C.2d 805 (Bkrtcy.N.D. Ga.1980).

**47.** 515 F.2d 913 (5th Cir. 1972).

**48.** *Id.* at 914.

**49.** 271 Ky. 494, 112 S.W.2d 673 (1938).

**50.** *Id.* at 495–96, 112 S.W.2d 673.