**PANOTEX PIPE LINE COMPANY
et al., Plaintiffs-Appellants,**

v.

**PHILLIPS PETROLEUM COMPANY
and Diamond Shamrock Corpo-
ration, Defendants-Appellees.**

No. 71–1335.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1972.

Urban A. Lester, Peyton Ford, Samuel K. Abrams, Lester, Rothwell & Contrucci, Ford, Ayer & Horan, Washington, D. C., for plaintiffs-appellants; Robert L. Templeton, Amarillo, Tex., Leonard J. Emmerglick, Roger W. Langsdorf, Morison, Murphy, Abrams & Haddock, Irving R. M. Panzer, Washington, D. C., of counsel.

H. A. Berry, W. M. Sutton, A. W. So-Relle, III, W. E. Notestein, Underwood, Wilson, Sutton, Heare & Berry, Amarillo, Tex., for defendant-appellee, Diamond Shamrock Corp.

C. J. Roberts, Morris Harrell, Stan McMurry, Dallas, Tex., Lloyd G. Minter, Kenneth Heady, Bartlesville, Okl., Rain, Harrell, Emery, Young & Doke, Dallas, Tex., for defendant-appellee, Phillips Petroleum Co.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

BELL, Circuit Judge:

This appeal arises out of an antitrust litigation. The district court directed verdicts for the defendants. We affirm.

Cameron and its pipeline subsidiary, Panotex, claimed damages jointly and severally against Phillips and Shamrock, alleging a conspiracy between them, and also a conspiracy between each of them and their respective subsidiaries, Phillips Pipe Line Company and Shamrock Pipe Line Corporation. The gist of the complaint was a conspiracy, as stated, to restrain and monopolize, and to attempt to monopolize interstate commerce in the purchase and transportation of crude oil in designated areas in violation of §§ 1 and 2 of the Sherman Act. 15 U.S.C.A. §§ 1 and 2. The cause of action also alleged individual conduct on the part of Phillips and Shamrock in violation of the same statutes. The prayer was for damages and injunctive relief under §§ 4 and 16 of the Clayon Act. 15 U.S.C.A. §§ 15 and 26. The complaint and the evidence introduced in support thereof bottoms out as a claim that defendants attempted to foreclose a competitor, and having failed in that, to thereafter restrict the competitor.

The cause was tried to a jury. Motions for directed verdicts filed by Phillips and Shamrock were denied by the district court at the close of plaintiffs' case. Defendant Phillips then proceeded to put on its defense. Shamrock put in a part of its evidence through cross-examination of witnesses for Phillips. After two days of defense evidence, the court suggested, sua sponte, that Shamrock again move for a directed verdict. Shamrock so moved and the motion was granted. Phillips then asked for the same relief and its motion was granted. Counterclaims against Cameron and Panotex were severed and are not a part of this appeal.

There are three assignments of error. First, plaintiffs urge that it was prejudicial procedural error to grant motions for directed verdicts in the middle of defendants' cases, i. e., at a random time

during the trial. The contention is that a directed verdict may be granted under Rule 50, F.R.Civ.P., only after the opening statement of opposing counsel, at the close of the evidence offered by an opponent, or at the close of all of the evidence, citing 5A Moore's Federal Practice, par. 50.04. Plaintiffs also assign error on a substantive basis in the granting of directed verdicts, urging that the evidence was sufficient to make a jury question. Lastly, error is asserted on the basis of the exclusion of certain items of evidence offered by plaintiffs.

The facts will be detailed in connection with the discussion of the alleged substantive error in directing verdicts for defendants. We proceed first to a discussion of the claimed procedural error.

### I.

The motions for directed verdict were granted during the presentation of the defense testimony. There was extensive colloquy between the court and counsel. The posture of the case at the time was somewhat complex in that the counterclaims of each defendant based on alleged antitrust violations by plaintiffs were being tried to the same jury. Plaintiffs' proof was voluminous and the court indicated that it had reviewed all of the testimony to date and was inclined to reconsider the motion of Shamrock for a directed verdict, and also to sever Shamrock's counterclaim. (This was the previously overruled motion for directed verdict.) The court then ruled as indicated for Shamrock. At that point, plaintiffs joined with Phillips in moving for a mistrial because of the hiatus and confusion left in the proof as to liability and damages due to the removal of Shamrock. Phillips had moved for a directed verdict following the grant of Shamrock's motion but this motion was overruled. Following the joint motion for mistrial, the court reconsidered and granted Phillips' motion for directed verdict and also severed its counterclaim.

At no time during the proceeding did plaintiffs offer any objection whatever to the timing of the directed verdicts. Moreover, nothing was said during the proceeding which pointed to any prejudice to plaintiffs from the standpoint of timing.

There was a hearing on the form of the final judgment about a month later. At this hearing, plaintiffs took the position for the first time that they were prejudiced by the timing of the grant of the motions in that they had previously reserved the right to redirect examination of certain witnesses. The record does not reflect this reservation. The court, in fact, required plaintiffs to complete their case prior to closing.

At the same hearing, plaintiffs urged the court to make it clear in the final judgment that the motions for directed verdicts were granted on the state of the record at the time the motions were granted. The court and all counsel agreed that this was the case and the judgment so provides. Having this in mind, plaintiffs take a different position here with respect to prejudice. They no longer urge the reservation of the right to redirect examination of the witnesses. They now contend that the court granted them the right to rebut evidence put in by Phillips in two instances. This evidence, produced from the files of Shell Oil Company, consisted of commitments to Cameron from oil producers to sell crude oil for transportation by Panotex. The pipeline of Panotex connected with that of Shell and all Cameron sales were to Shell. The other evidence was the record of oil deliveries from Cameron to Shell via Panotex. We are unable to perceive the need to rebut this evidence. We are not told how it could be rebutted, nor how it was in any way prejudicial. We find no prejudice to plaintiffs in these events.

We do not reach the question whether Rule 50, F.R.Civ.P.,[1] prohibits the grant-

---

1. Rule 50:
 "(a) Motion for Directed Verdict: When Made; Effect. A party who

moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that

ing of a motion for directed verdict during the presentation of a defendant's case. The rule contains no such restriction nor have we found any authority supporting such a restriction. Indeed, we have found no case in point one way or the other. The Supreme Court long ago pointed to the salutary purpose of a motion for directed verdict. In Merchants' National Bank of Boston v. State National Bank of Boston, 1871, 10 Wall. 604, 77 U.S. 604, 19 L.Ed. 1008, it was said with reference thereto:

> "According to the settled practice in the courts of the United States, it was proper to give the instruction if it were clear the plaintiff could not recover. It would have been idle to proceed further when such must be the inevitable result. The practice is a wise one. It saves time and costs; it gives the certainty of applied science to the results of judicial investigation; it draws clearly the line which separates the provinces of the judge and the jury, and fixes where it belongs the responsibility which should be assumed by the court." 77 U.S. at 637

▋ In the end, the question of directing a verdict for a defendant during the defendant's presentation is one of orderly procedure in the frame of reference of trial court discretion, procedural due process, and a fair trial. Here there is nothing of record to support any denigration of procedural due process or the essence of a fair trial. Thus we find no error as claimed.

From the view that plaintiffs must show prejudice, the situation is analogous to federal criminal procedure where the court commits error by reserving a ruling on a defendant's motion to acquit.

The error is harmless absent a showing that the evidence was insufficient to sustain a conviction when the government rested its case. Cooper v. United States, 5 Cir., 1963, 321 F.2d 274, 277; Montoya v. United States, 5 Cir., 1968, 402 F.2d 847, 849–850; United States v. Day, 5 Cir., 1971, 438 F.2d 121, 122.

As Justice Field stated for the court in Oscanyan v. Winchester Repeating Arms Company, 1881, 103 U.S. 261, 26 L.Ed. 539, in a case where a verdict was directed following the opening statement of counsel:

> " . . . if in the progress of a trial, either by such admission [of counsel] or proof, a fact is developed which must necessarily put an end to the action, the court may, upon its own motion or that of counsel, act upon it and close the case." 103 U.S. at 263

## II.

Before considering the merits of the action of the district court in granting the motions for directed verdict, it will be necessary to resolve the question presented with respect to the exclusion of certain evidence offered by plaintiffs. This question involves three separate items.

The first item is an inter-corporate letter from one Phillips employee to another, dated November 11, 1960, setting out the general situation in the industry as to oil reserves in the general geographical area pertinent to this suit. The letter mentions the prospect of raiding Shamrock's customers to increase Phillips' crude oil supply. The crude oil reserves and acquisition prospects of many oil companies in the area are also discussed. The position of plaintiffs is

---

the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is

effective without any assent of the jury. "(b) Motion for Judgment Notwithstanding the Verdict. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. . . . "

that this letter was admissible to show motive for later concerted action between Phillips and Shamrock. The district court excluded it on the ground that it originated prior to the period of activities giving rise to the suit.

■ We hold that this letter was admissible, and was to be given such weight as it might deserve in light of the proof, if any, as to any future concerted action between Phillips and Shamrock. Cf. Federal Trade Commission v. Cement Institute, 1948, 333 U.S. 683, 705, 68 S.Ct. 793, 92 L.Ed. 1010. Accordingly, it will be considered here in determining whether verdicts should have been directed.

■ The next item was a contract showing that Shamrock purchased casinghead gas from oil producers. Plaintiffs, not having a refinery, purchased only crude oil and condensate. The argument is that Shamrock used casinghead gas purchases as a lever to obtain contracts for the purchase of crude oil and condensate; hence, an illegal tying arrangement. The district court excluded this evidence on the ground that it was irrelevant to the pleadings.

Ordinarily this evidence would have been admissible to show the vehicle for an illegal tying arrangement as a part of an attempt to monopolize or restrain trade on the part of Shamrock. The admission would be subject, however, to the introduction of some evidence of a tying arrangement. There was no proffer of evidence to show such a tying arrangement at the time this evidence was excluded nor at any other time. Thus the error was in the abstract and harmless.

The third item of evidence is a group of letters and memoranda having to do with the effort of Cameron to obtain a loan from the First National City Bank of Houston, Texas, with which to finance their proposed pipeline. The fact of attempting to obtain this loan was stipulated. There was also full testimony regarding the effort. Plaintiffs wished to put in such portions of the letters and memoranda as would reflect Phillips' alleged antagonism to the proposed pipeline and as would provide a basis for an inference that the loan was not made because of Phillips' influence over the bank. The district court excluded this evidence on grounds that the documents contained hearsay, as well as self serving opinions and conclusions on the part of a Cameron agent. With these objectionable portions removed from the documents, the court was of the opinion that nothing of coherent value would remain to be considered by the jury.

■ This evidence consisted of twelve letters and three memoranda prepared by Cameron's agent and one letter from an officer of the Houston bank regarding Cameron's application for the loan. The court properly refused to admit the conclusions and opinions of Cameron's agent which were contained in the letters and memoranda. They were not admissible under the Business Records Act, 28 U.S.C.A. § 1732(a); Standard Oil Company of California v. Moore, 9 Cir., 1957, 251 F.2d 188, 213–214. No effort was made by plaintiffs to introduce the documents with the conclusions and opinions deleted and thus we need not consider whether the remaining documents or parts thereof qualified as an exception to the hearsay rule under the Business Records Act. The court did not err in excluding this evidence.

There is one other item of excluded evidence concerning which plaintiffs assign error but it goes to the question of damages. As will be seen, we do not reach the question of damages and thus it is unnecessary to consider this assignment of error.

### III.

We now turn to question whether the court erred in directing verdicts for defendants or either of them. The test to be applied is the now familiar one of Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365 (en banc), where we said:

"On motions for directed verdict . . . the Court should consider all of the evidence—not just that evidence which

supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded man in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury." 411 F.2d at 374.

Phillips and Shamrock were integrated oil companies in that they owned and operated refineries in the geographical area with which we are concerned. They transported their own production as well as the production of others to their refineries. The transportation was by their subsidiary pipeline companies. Cameron had no production but purchased from others for transportation over Panotex, its subsidiary, to Shell's pipeline.

It is a fact also that a pipeline tends to be a natural monopoly. Plaintiffs offered testimony to the effect that the first pipeline into an area customarily gets the connections that are available in the oil fields. If two lines enter at about the same time, they are likely to divide the available production. In addition, a trucking operation is not competitive with a pipeline.

As the Supreme Court has noted, Federal Trade Commission v. Cement Institute, supra; Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 46, 31 S.Ct. 502, 55 L.Ed. 619, evidence as to events prior to and following alleged antitrust activity is admissible if it tends to show the purpose and character of particular transactions un-

der investigation. Thus it is that the charges against defendants must be viewed in the background of the facts as they existed prior to entry of Cameron and Panotex into the pipeline market; indeed prior to the creation and construction of Panotex.

### Background and Relevant Markets

The controversy involves competition between three pipelines, Phillips, Shamrock and Panotex, in the general area of the Texas-Oklahoma border. Oil situated in two counties in Oklahoma is involved: Beaver and Texas Counties. These counties border on the north boundary of the State of Texas. Oil situated in ten Texas counties lying immediately south of these Oklahoma counties is also involved. The counties are Hansford, Ochiltree, Lipscomb, Moore, Hutchinson, Roberts, Hemphill, Carson, Gray and Wheeler.[2]

Phillips' refinery is in Hutchinson County. Shamrock's refinery is in Moore County. As of 1954 the crude oil for these refineries was supplied out of the Texas panhandle oil field, in Moore, Hutchinson, Roberts, Carson, Gray and Wheeler Counties. The reserves in this field were becoming inadequate to meet the needs of the refineries. New fields were being developed in the counties to the north and east. By 1957, Shamrock had extended its pipeline north into fields located in Hansford and Ochiltree Counties. Phillips remained in the panhandle.[3]

By 1961, Phillips had extended its pipeline through the southeast corner of Hansford County to connect one field, and on through Ochiltree County to connect with several fields and into Texas and Beaver Counties in Oklahoma (the Camrick area) to connect with fields there. Its pipeline crossed that of Shamrock in Ochiltree County.

In 1961, Cameron was engaged in purchasing crude oil in the Camrick area of

---

2. See Appendix A attached for a map of the general area and the pipelines pertinent to this litigation.

3. By 1968, Shamrock had extended its line to southern Colorado to obtain oil for its refinery.

Texas and Beaver Counties and transporting it by truck for resale. The Phillips pipeline extension into the Camrick area brought about a considerable reduction in Cameron's trucking business but that reduction is not a basis of the claim here.

In 1963 Mobil Oil, a company not involved in the controversy here, extended its pipeline into the Camrick area from the north.

The area to the east of these lines, in Texas and Oklahoma was undeveloped. Thereafter, beginning in 1963, fields were developed in this eastern area, in Beaver County, Oklahoma, and in Lipscomb County and in the north part of Hemphill County, in Texas.

By August 1963, Shamrock had extended its pipeline eastward into this new area in Lipscomb County to connect with the Frass and W. Follett fields. This was pre-Panotex.

During this year of 1963 the Panotex pipeline was conceived by Cameron and commitments from producers were being obtained. Primary equity financing was obtained in late 1963 from Alliance Business Investment Company. In February 1964 a loan was sought from the Houston bank. This effort was unsuccessful and financing was sought and obtained in New York in July 1964. Panotex came into corporate existence in July 1964, its line was commenced in October 1964 and became operative in January 1965.

Meanwhile, as Cameron's president discovered in 1963, Phillips was soliciting commitments from purchasers in 1962 in the Oklahoma part of the Texas-Oklahoma area where Cameron began solicitations in 1963. These solicitations were for production as far east as the Logan area in Beaver County, Oklahoma. Phillips had considerable production of its own in the Como area and was trucking six to seven thousand barrels of oil per day from there to Camrick. This oil amounted to approximately ten per cent of the capacity of Phillips' refinery.

Cameron testified that he began looking at this area after his Camrick trucking operation declined in 1961. His idea was that new pools of oil would be developed in this eastward territory in Beaver and Lipscomb Counties and this proved to be the case in the next few years.

This brings us to the relevant markets. Plaintiffs tried the case on the theory of three relevant markets. We will consider the case on that basis and without determining the correctness of the delineation.

Area I, according to plaintiffs' theory of suit, is the Camrick area, heretofore described. It was served by Phillips' pipeline beginning in 1961 and by Mobil beginning in 1963. Panotex has never entered this market.

Area II is south Beaver County and mainly the Balko, Elmwood and Como fields in that county. Phillips extended its pipeline east through the Balko and Elmwood fields and to Como in September 1964. Panotex constructed its line westward through these fields in January 1965. Prior to these extensions, Cameron and Phillips were advised of what the other proposed to do.

Shamrock served neither Area I or II by pipeline. Phillips does not serve Area III. Area III consists of the Logan field in Beaver County, Oklahoma and all of Lipscomb County, and the Feldman field in Hemphill County, Texas. It is served by Shamrock and Panotex. The Panotex line began at the Shell pipeline at Elk City in Beckham County, Oklahoma, considerably southeast of the areas in question, and thence extended in a northwesterly direction into fields in Lipscomb and Hemphill Counties, Texas, namely the Feldman, West Higgins, Kelln and Mathers field. It is to be noted that Panotex had a monopoly in these fields until 1968 when Shamrock entered Kelln and West Higgins. The Cranford, Bishop and West Durham fields had been developed along the line of Panotex by 1968 and were served exclusively by Panotex.

The line of Panotex continued northwesterly to reach the Lipscomb and

Bechthold fields in Lipscomb County, Texas, and the Logan field in Beaver County, Oklahoma. It appears that Shamrock reached the Lipscomb field in August 1963 and extended to the Logan and Bechthold fields in August 1964. Shamrock, prior to its extension and the entry of Panotex, had been purchasing oil from the Logan area from a trucker who served the area.

### The Case Against Phillips and its Subsidiary

The issue presented is the foreclosing or restriction of a competitor, Cameron-Panotex. The claim is premised on conduct of Phillips, acting alone or in league with its pipeline subsidiary or with Shamrock.

■ We begin by eliminating Area I. Panotex is not in Area I. Phillips has been there since 1961. Cameron-Panotex makes no case whatever from a factual standpoint on being foreclosed from or restrained in Area I, either through an attempted monopoly or by way of a restraint. The facts at best show only that Area I had no pipeline service until 1961 when Phillips entered. There is no evidence that Cameron-Panotex ever considered entering Area I after the entry of Phillips. The evidence demonstrates no more than a normal business venture on the part of Phillips in entering Area I (Camrick). The issue narrows to Areas II and III.

Area II consists of only three fields, Balko, Elmwood and Como. They are served by Phillips and Cameron-Panotex. Phillips extended east from Area I in September 1964 and Panotex commenced service in January 1965. Phillips had solicited commitments in Area II in 1962 according to Cameron. It was trucking oil out of the area and had production of its own on 16,000 acres of leases in the Como area. Phillips also solicited in the Logan field in Area III. Cameron began solicitations in the area in 1963. There was no previous pipeline service to Area II. Phillips had little success in obtaining commitments.

The evidence disclosed that plaintiffs were purchasing 100 per cent of the Balko production, most of the Elmwood production, fifty per cent of the Como production (Phillips had some production), and all of the Logan production except for one producer. This was the situation immediately upon the completion of the Panotex line and plaintiffs obtained all of the oil that was committed to them. In the ensuing years, Panotex has obtained all new production in Area II and at Logan. Phillips has not connected to a new lease since 1964.

■ When Cameron announced in 1964 that it had received financing, Phillips met Cameron's price and contract terms. Its prior offers had been higher and its contract terms more stringent. In addition, Phillips agreed with its pipeline subsidiary to guarantee it a seven per cent return on investment as a condition of a pipeline extension into Area II. The commitments of Phillips, according to plaintiffs, were insufficient to produce such a return. It does appear that the commitments were less than the number theretofore insisted upon by the Phillips pipeline subsidiary. There is no proof, however, that the extension was unprofitable and thus something from which an inference of predatory conduct could be drawn. In meeting the Panotex competition. Phillips took three simultaneous steps: (1) it met Cameron's price offer; (2) it met Cameron's contract requirements as to period of contract; (3) it guaranteed its pipeline subsidiary a seven per cent return so as to replace its trucking operation with a pipeline. The proof stops here. It goes no further than to show that Phillips needed the oil for its refinery and would be preempted by the entry and consequent monopoly of another pipeline. It is true that the evidence shows that Phillips considered Area II as "its own backyard" and sought to protect its position in the area. This, however, amounts to nothing more than a proper business motive under the circumstances. Cf. Times-Picayune Publishing Company v. United States, 1953, 345 U.S. 594, 627, 73

S.Ct. 872, 890, 97 L.Ed. 1277, on the necessity to prove something more than a "step predominantly motivated by legitimate business aims . . ." to show an intent to monopolize.

At this point we find that the evidence of a conspiracy between Phillips and its pipeline subsidiary is nonexistent from the point of showing a violation of §§ 1 or 2 of the Sherman Act.

This is likewise true as to showing an attempt to monopolize on the part of Phillips. Assuming *arguendo* intent and a relevant market, a dangerous probability of success is clearly lacking. See Cliff Food Stores, Inc. v. Kroger, Inc., 5 Cir., 1969, 417 F.2d 203, 206–208.

■ The action of Phillips in extending into Area II did not rise above a protective motive. Phillips was already present through a trucking operation and through its own production. Panotex was transporting in another direction and away from Phillips' refinery. Protection of its refinery by the assurance of some of the oil reserves in Area II was no more than a normal business practice absent conduct calculated to bar the entry of a competitor into Area II or to drive a competitor out of the area. The proof disclosed no such conduct on the part of Phillips. There was no proof of predatory conduct or of conduct which was illegal per se. It follows that the proof was insufficient to make a jury question as to a restraint of trade by Phillips from the conduct disclosed to this point.

■ Plaintiffs urge that Phillips violated the Sherman Act by allegedly blocking Cameron's application for a loan from the Houston bank with which to construct Panotex. The Chairman of Phillips happened to be a director of the bank. Phillips had been a long time large depositor in the bank. The other side of the coin is that the loan was never formally rejected although some five months of negotiations took place. The bank was troubled by the probability of success of the venture, considering competitive pipelines in the proposed

Panotex area and the status of Cameron's commitments. There is no evidence that Phillips influenced by word or deed the decision not to make the loan. There the matter ends. A Phillips officer on the bank board and a Phillips deposit in the bank will not suffice as a base for an inference of loan influence and in turn, for an inference of an antitrust violation. The bank sent a consultant to discuss the prospects of Panotex with Phillips and Phillips advised that it intended to compete for the oil. This was a business judgment in line with the needs of its refinery. Phillips was not willing to give up the area where it competed to Panotex.

There is one other charge against Phillips and it stems from an alleged division of markets as between Shamrock and Phillips. This will be considered following the discussion of the case against Shamrock.

### The Case Against Shamrock and Its Subsidiary

■ There is no evidence that Shamrock conspired with its pipeline to restrain trade or to monopolize. The competing lines were simply built either prior to the entry of Panotex or after the entry of Panotex. The subsidiary pipeline did no more than build lines, set prices and make purchases. Shamrock's prices were uniform throughout the Shamrock system except in one instance. This one instance occurred for a short time in the Logan and Bechthold fields. Shamrock first attempted to pay producers a price less than that paid by Cameron. When Cameron obtained commitments from eighty per cent of the producers, Shamrock raised its net offer to the producers. After this price increase, Shamrock's price, while exceeding that of Cameron by two cents per barrel, was uniform with its prices throughout the remainder of its system. Moreover, Cameron had contracts with its producers to hold them providing it met the prices of others.

The competition between Panotex and Shamrock was all in Area III. By and

large, as stated, Shamrock was in this area prior to the entry of Panotex and, like Phillips, was seeking oil for its refinery. There is no evidence that the conduct of Shamrock or its subsidiary exceeded a protective position. It competed with Panotex for oil but without predatory action. It engaged in no conduct which can be described as illegal per se under the Sherman Act. The proof is clear that there was no dangerous probability of a monopoly.

We conclude that the evidence was insufficient to make jury issues on the charges against Shamrock to this point.

### The Alleged Phillips-Shamrock Conspiracy

 The proof was that Phillips and Shamrock had been competing in the general area involved for more than 40 years. There was evidence as to specific examples of competition between them. Plaintiffs' case, however, comes down to evidence of a telephone conversation between Phillips and Shamrock, made to Phillips by Shamrock in 1964, wherein Shamrock inquired whether Phillips had any interest in extending into the Logan area. Phillips answered that it did. Shamrock replied that it too would also have to go into Logan and that "it won't be the first time we have been competitors."

Plaintiffs make much of the fact that Shamrock extended to Logan and Phillips did not. Phillips went no further east than the Como field in Area II while Shamrock went no further west than Logan. Standing alone, this might give rise to an inference of a division of markets between Phillips and Shamrock to the detriment of their mutual competitor, Panotex. But this evidence does not stand alone.

Phillips had been seeking commitments in the Logan area without success. Panotex had every producer in the field except one. Shamrock acquired that one. The interest of Phillips was such that it staked a right of way into Logan but abandoned the prospect for lack of business.

Phillips had production of its own in the Como field and some additional suppliers. These facts gave good reason for Phillips to stop at Como and for Shamrock to stop at Logan. They established a basis for a business judgment resting on the idea that a certain amount of production was necessary to warrant the expense of extending the pipelines. Any inference of a division of markets must give way to these facts.

This case began in 1964. It has been strenuously developed through discovery and otherwise. It occupied more than two weeks of trial time. In the end there is no substance to plaintiffs' claims. Under the test of viewing the evidence in the light most favorable to plaintiffs and giving them the benefit of all inferences which might reasonably be drawn from established facts, we have nothing more than competition between the parties.

 It seems implicit in plaintiffs' position that they view the law as protecting them from competition, whether from those already in the market or from newcomers to the market. This is not the law, and the fact that a pipeline can be a natural monopoly does not mean that it is protected from competition. The Sherman Act fosters competition by protecting it from illegal restraints and monopoly power. Northern Pacific Railway Company v. United States, 1958, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545. Plaintiffs, of course, are protected to this extent. However, after having considered all of the evidence and every contention made by plaintiffs, we find no evidence of an illegal restraint or of a proscribed attempt to monopolize on the part of defendants, individually or collectively. The record is one of allowable competition—nothing more.

We hold that the district court did not err in directing verdicts for Phillips and Shamrock.

Affirmed.

APPENDIX "A"