**STEP–SAVER DATA SYSTEMS, INC., Plaintiff,**

v.

**WYSE TECHNOLOGY and The Software Link, Inc., Defendants.**

**Civ. A. No. 89–7203.**

United States District Court, E.D. Pennsylvania.

Oct. 15, 1990.

Ronald W. Silverman, Francis K. Clark, King of Prussia, Pa., Jeff Marchant, Lashner, Victor and Maschmeyer, Philadelphia, Pa., for Bankruptcy Debtor.

Jay P. Hendrickson, Hendrickson, Higbie & Cole, San Francisco, Cal., Joseph Schumacher, Abraham, Pressman & Bauer, Philadelphia, Pa., for defendant Wyse.

Stephen Dorvee, Debra G. Buster, Arnall, Golden & Gregory, Atlanta, Ga., Frederick C. Fletcher, II, Philadelphia, Pa., for defendant Software.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiff Step–Saver Data Systems, Inc. ("Step–Saver") commenced this diversity action against defendants Wyse Technology ("Wyse") and The Software Link, Inc., ("Software Link") on October 5, 1990. The Court in this memorandum will address the plaintiff's allegations as set forth in plaintiff's Post–Trial Motion for a New Trial.[1]

Step–Saver's complaint alleged six causes of action against the defendants: (1) intentional misrepresentation, (2) negligent misrepresentation, (3) breach of express warranties, (4) breach of implied warranties of merchantability and of fitness for a particular purpose, (5) negligence, and (6) breach of contract. After a ten-day bifurcated trial, the jury returned a verdict in favor of the defendant, Wyse, on the issue of liability with respect to plaintiff's claims of breach of express warranty and breach of implied warranty by answering "NO" to each of the following interrogatories.

1. Has Step–Saver proved by a preponderance of evidence that defendant Wyse Technology breached its express warranty to replace a defective Wyse–60 terminal with a new or rebuilt product or repair it with new or rebuilt parts and that its breach was a proximate cause of damage to Step–Saver?

2. Has Step–Saver proved by a preponderance of evidence that defendant Wyse Technology at the time of the sale to Step–Saver had reason to know of the particular purpose for which the Wyse–60 terminals were purchased and that Step–Saver relied

---

1. Plaintiff originally filed a complaint seeking a declaratory judgement that the defendants were responsible for any liability that Step–Saver may have to its customers as a result of customer suits. In that complaint, Step–Saver also alleged that it incurred over $75,000.00 in direct damages as a result of the product's alleged defects. This Court dismissed that action, finding the declaratory judgement portion of the action to be at odds with the Declaratory Judgement Act, and finding the direct damages portion of the action created unnecessary interference with the pending litigation in eleven state courts and one federal court. Step–Saver appealed to the Third Circuit, which affirmed this Court's dismissal of the declaratory judgement action. *Step–Saver Data Systems v. Wyse Technology,* 912 F.2d 643 (3d Cir.1990). However, the Court, per Judge Becker, pointed out that, with respect to Step–Saver's direct damages claim, Step–Saver had a cause of action. That cause of action is encompassed in the instant case.

on Wyse's skill or judgement, creating an implied warranty of fitness, and that the implied warranty of fitness was breached and that the breach was a proximate cause of damage to Step–Saver?

Prior to trial, the Court granted summary judgement in favor of Wyse and against Step–Saver on Step–Saver's claims of negligent misrepresentation, negligence and intentional misrepresentation. Likewise, prior to trial, the Court granted summary judgement in favor of Software Link and against Step–Saver on Step–Saver's negligent misrepresentation, negligence and implied warranty claims. On the basis of the evidence presented by the plaintiff at trial, the Court granted a directed verdict in favor of Software Link in connection with its claims of intentional misrepresentation, breach of contract, and breach of express warranty.

Plaintiff Step–Saver filed a post-trial motion for a new trial and oral argument on the issues therein was heard before this Judge on September 5, 1990.

■ The authority to grant a new trial rests within the sound discretion of the trial court whose duty it is to ensure that the verdict does not result in a miscarriage of justice. *American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943, 948 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984); *Marks v. Mobil Oil Corp.*, 562 F.Supp. 759, 764 (E.D.Pa. 1983), *affirmed without opinion*, 727 F.2d 1100 (3d Cir.1984). There are three grounds for granting a motion for a new trial: (1) manifest error of law; (2) manifest error of fact; and (3) newly discovered evidence. 6A Moore, Lucas & Grother, Moore's Federal Practice, ¶ 59.07, at 59–73 (2d ed. 1984). *See Thomas v. E.J. Korvette, Inc.*, 476 F.2d 471, 474–75 (3d Cir. 1973). Upon examination and consideration of the allegations of error set forth by Step–Saver in its motion for a new trial, the Court finds that none of them, either alone or considered together, provide any basis for a new trial. For the reasons discussed below, the Court has determined that plaintiff's motion for a new trial will be denied.

In this memorandum, the Court will address only those allegations of error which were briefed and argued by Step–Saver.

I. *Allegations of Error Regarding Defendant Software Link*

A. Limited Use License Agreement

■ The bulk of plaintiff's allegations of error concerning Software Link, paragraphs 1 through 14 of their motion for a new trial, revolve around the Limited Use License Agreement ("licensing agreement"). Plaintiff's primary arguments with regard to the licensing agreement are that the Court erred, in excluding as parol evidence extraneous evidence of negotiations and communications between the parties made prior to the delivery of the product and the licensing agreement, in finding that the licensing agreement applied to Step–Saver, and in finding that the licensing agreement effectively disclaimed all implied warranties of merchantability and of fitness for a particular purpose as to Step–Saver.

The transcript in this case, commencing at June 26, 1990, at page 72, sets forth the fact that the Court heard and considered all the evidence proffered by Step–Saver in a hearing outside the presence of the jury together with the words of the licensing agreement and determined that the evidence proffered by Step–Saver was not consistent with the express terms of the agreement. The Court found that the agreement on the Multi–Link package was a waiver of warranties and a limitation of remedies and, as the agreement stated, was the "complete and exclusive agreement" between the parties. As such, the Court correctly found that no evidence that contradicts that agreement could be admitted into evidence in accordance with U.C.C. § 2–202.

As the Third Circuit explained in *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358 (3d Cir.1987), the parol evidence rule prevents the fact finder from considering evidence extrinsic to a final written agreement that contradicts the terms of that agreement. However, before it can be de-

termined whether the offered evidence contradicts the writing, the court must determine what the writing means. "Therefore, the process of contract interpretation must take place before application of rules that exclude evidence." *Id.*, at 362.

In the process of contract interpretation, the question whether a contract or its terms are ambiguous is one of law. *Id.*, at 362–63. As the Third Circuit stated in *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980):

> It is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning. The trial judge must then determine if a full evidentiary hearing is warranted. If a *reasonable* alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder.

(emphasis in original) (citing 3 Corbin, Contracts § 542 (1960)).

The Court found that the agreement was not susceptible to more than one meaning. Although the document which is printed on one full side of the box in which Multi–Link Advanced was packaged is entitled "Limited Use License Agreement", it clearly contains, in large boldface print, a waiver of expressed and implied warranties and conspicuously sets forth a limitation of remedies.

The limited warranty section specifically provides, in print which is larger than the print entitled "license" and in boldface capital letters:

> EXCEPT AS STATED BELOW IN THIS SECTION THIS PROGRAM IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM IS WITH YOU. SHOULD THE PROGRAM PROVE DEFECTIVE, YOU (AND NOT TSL [THE SOFTWARE LINK] OR AN AUTHORIZED DEALER) ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION. SOME STATES DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS AND YOU MAY ALSO HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

Under the section entitled "Limitation of Remedies" is printed the following, also in large, boldface type:

> IN NO EVENT WILL TSL [THE SOFTWARE LINK] BE LIABLE TO YOU FOR ANY DAMAGES, INCLUDING ANY LOST PROFITS, LOST SAVINGS OR OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE SUCH PROGRAM EVEN IF TSL OR AN AUTHORIZED DEALER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, OR FOR ANY CLAIM BY ANY OTHER PARTY.

The agreement also states, as is contemplated by U.C.C. § 2–202, the following, also in boldface, capital letters:

> YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, UNDERSTAND IT AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS. YOU FURTHER AGREE THAT IT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN YOU AND TSL [THE SOFTWARE LINK] AND ITS DEALER ("US") WHICH SUPERSEDES ANY PROPOSAL OR PRIOR AGREEMENT, ORAL OR WRITTEN, AND ANY OTHER COMMUNICATIONS BETWEEN US RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.

Therefore, the Court properly held, in accordance with U.C.C. § 2–202, that no extrinsic evidence of prior or contempora-

neous agreements which contradict the terms of the licensing agreement would be admitted. Trans. of Tr., June 26, 1990, at 76–79.

■ Step–Saver also contends that the language on the MultiLink box, as well as that in the user's guide, is not applicable to Step–Saver because Step–Saver was a dealer and not a user. The Court rejects this contention. Step–Saver's president, Barry Greebel, testified that Step–Saver never entered into any dealer agreement with Software Link, and, in fact, specifically refused to do so. Trans. of Tr., June 26, 1990, at 57. Furthermore, the evidence at trial showed that after Step–Saver purchased the Multi–Link software from Software Link, it integrated that software into its new product, the multi-user system, and sold it as a complete, integrated unit. There was no separate sale of the Multi–Link software.

### B. The Directed Verdict

■ Step–Saver alleges that the Court erred in granting the Software Link's motion for a directed verdict with respect to Step–Saver's intentional misrepresentation, express warranties, and implied warranties claims. Software made this motion pursuant to F.R.C.P. 50 at the close of Step–Saver's case, at the end of the fifth day of trial. At that time, the Court granted Software Link's motion for a directed verdict with respect to the intentional misrepresentation claim and read an opinion into the record on that issue outside of the presence of the jury at the beginning of the sixth day. After presenting that opinion, the Court directed counsel for Step–Saver and for Software Link to prepare memoranda on the other claims, express warranties and implied warranties. The Court requested that the parties brief the issues surrounding the motion, particularly, the applicability of *Consolidated Data Terminals v. Applied Digital Data Systems*, 708 F.2d 385 (9th Cir.1983). In order to conserve the Court's time, the jury was then brought in and Wyse began presentation of its defense for the remainder of day six and for day seven. At the beginning of day eight, be-

fore the jury was brought in, Software Link renewed its Rule 50 motion for a directed verdict and the Court heard argument on the motion. After the Court heard argument on the renewed motion, the jury returned and Wyse finished presenting its defense. At the beginning of the ninth day of trial, the Court granted Software Link's motion for directed verdict as to the two remaining causes of action against it, that is, Step–Saver's claims based on express warranty and implied warranty.

Step–Saver alleges in its post-trial motion for a new trial that the Court's granting of Software Link's motion for a directed verdict "in the middle of TSL's [the Software Link] case ... gave the jury the unfair impression that TSL had 'won' the case based upon the testimony of its witnesses."

Step–Saver's allegation that the jury was given an unfair impression is absolutely baseless considering the Court's instructions to the jury regarding Software Link's absence for the remainder of the trial, given immediately after the directed verdict was granted.

> Good morning, good morning, be seated. I have news for you.... [C]ertain legal arguments have been taking place in this case and I just want you to know, by virtue of matters that I'm not going to discuss with you now, but when you are all finished, I'm going to give you a copy of a memorandum which the Court wrote over the weekend and that ... on the basis of, I will call it legalese in the law, the technicalities as it were, The Software Link is no longer in this case.
>
> Now, you have one defendant left in the case and the fact that I, as the judge, issued this memorandum and made the rulings that I did in connection with Software Link *is not to interfere in any way or to be considered in any way with your judgement as to Wyse.*

Trans. of Tr., July 9, 1990, at 20–21 (emphasis added).

Under F.R.C.P. 50, once the plaintiff's case has been completed, the district court may grant a directed verdict for the defendant at any time. *Wyper v. Providence Washington Insurance Co.*, 533 F.2d 57,

60–61 n. 4 (2d Cir.1976). "In the end, the question of granting a directed verdict for a defendant during the defendant's presentation is one of orderly procedure in the frame of reference of trial court discretion, procedural due process, and a fair trial." *Panotex Pipe Line Co. v. Phillips Petroleum Co.*, 457 F.2d 1279, 1283 (5th Cir.1972). Where, as here, there is nothing of record to support any "denigration of due process or the essence of a fair trial," the district court's discretion is controlling. *Id.* The Court's granting of Software Link's motion for a directed verdict was made in all due consideration of Step–Saver's right to a fair trial and to procedural due process. Step–Saver has failed to produce any evidence of record showing prejudice to its case against the remaining defendant, Wyse, as a result of the Court's granting of Software Link's motions. The Court, therefore, committed no error in granting Software Link's Rule 50 motion for a directed verdict as to Step–Saver's intentional misrepresentation, express warranties, or implied warranties claims.

■ In addition to Step–Saver's allegation that the Court's granting of Software Link's motion for a directed verdict on Step–Saver's claims of intentional misrepresentation, breach of implied warranty and breach of express warranty was procedurally in error, Step–Saver also alleges that the substantive basis for granting those directed verdicts was insufficient.

### (1) *Express and Implied Warranty*

To support its allegations that the Court erred in granting Software Link's motion for a directed verdict with respect to its express warranty and implied warranty claims, Step–Saver relies upon *Consolidated Data Terminals v. Applied Digital Data Systems,* 708 F.2d 385 (9th Cir.1983). *Consolidated Data* holds that "[w]here a contract includes both specific warranty language and a general disclaimer of warranty liability, the former [the specific warranty] prevails over the latter where the two cannot be reasonably reconciled." *Id.,* at 391 (citing New York law).

As stated in an opinion of the Court that was appended to the record, *Consolidated Data* is inapplicable to the express warranty in this case. Trans. of Tr., July 9, 1990 at 3. The express limited warranty in this case sets forth the agreement between Software Link and Step–Saver. It contains no warranty as to compatibility, nor does it contain a warranty as to capacity to support a specific number of terminals. In clear and conspicuous language the document specifically excludes such alleged warranties. Furthermore, the express limited warranty concludes with the following integration clause:

IT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN YOU AND TSL [the Software Link] AND ITS DEALER ("US") WHICH SUPERSEDES ANY PROPOSAL OR PRIOR AGREEMENT, ORAL OR WRITTEN, AND ANY OTHER COMMUNICATIONS BETWEEN US RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.

The courts in states which have adopted the Uniform Commercial Code are almost unanimous in holding that alleged express warranties are excluded by the use of language similar to that contained in the express limited warranty in this case. Although the parties have not supplied the Court with a decision from either the Supreme Court of Georgia or the Supreme Court of Pennsylvania dispositive of the issues in this case, it is predicted that Georgia and Pennsylvania would also hold that the express limited warranty in this case effectively excludes the alleged warranties of compatibility and capacity to support a specific number of terminals claimed by Step–Saver. *See Arkwright–Boston Mfrs. Mut. Ins. Co. v. Westinghouse Electric Corp.,* 844 F.2d 1174, 1180–82 (5th Cir. 1988); *Armco, Inc. v. New Horizon Development Company of Virginia,* 229 Va. 561, 331 S.E.2d 456 (1985); *Agristor Leasing v. Meuli,* 634 F.Supp. 1208, 1219 (D.Kan.1986), *aff'd,* 865 F.2d 1150 (10th Cir.1988); *Harris v. Sulcus Computer Corp.,* 175 Ga.App. 140, 332 S.E.2d 660 (1985); *Bruffey Contracting Co. v. Burroughs Corp.,* 522 F.Supp. 769, 772 (D.Md.

1981), *affirmed without opinion*, 681 F.2d 812 (4th Cir.1982); *APLications, Inc. v. Hewlett–Packard Co.*, 501 F.Supp. 129, 132 (S.D.N.Y.1980).

Therefore, the Court correctly determined that the disclaimer of warranties found in the Limited Use License Agreement effectively disclaimed the alleged express warranties of compatibility and capacity to support a specific number of terminals as to Step–Saver.

### (2) *Intentional Misrepresentation*

■ Step–Saver further alleges that the Court erred in granting Software Link's motion for a directed verdict with respect to the intentional misrepresentation claim.

■ The Uniform Commercial Code itself does not define "fraud" or "misrepresentation," but explicitly preserves the pre-Code law concerning those subjects. U.C.C. 1–103; *see also*, Anderson, *Uniform Commercial Code* §§ 721:4, 721:5, pp. 57–58 (3rd ed. 1984). Because the alleged misrepresentations occurred in either Pennsylvania or by telephone with representatives of Step–Saver located in Pennsylvania and the damages claimed occurred in Pennsylvania, the Court has applied the law of Pennsylvania concerning fraud and material misrepresentations.

■ Under Pennsylvania law, misrepresentation, also referred to as fraud, requires proof by a standard higher than the preponderance standard usually applied to civil cases. *Beardshall v. Minuteman Press International, Inc.*, 664 F.2d 23, 26 (3rd Cir.1981). The Supreme Court of Pennsylvania has held that fraud or intent to defraud must be proven by "evidence that is clear, precise and convincing." *Snell v. State Examining Board*, 490 Pa. 277, 281, 416 A.2d 468, 470 (1980). Whether evidence is credible is a question of fact, "but whether it meets the required standard which justifies its submission to the jury ... is always a question of law...." *Id.*, at 26. Thus, "the trial judge must decide as a matter of law before he submits a case to the jury whether plaintiff[']s evidence is sufficiently clear, precise and convincing to make a prima facie case." *Beardshall*, 664 F.2d at 26.

■ Under Pennsylvania law, the following elements must be proven to maintain a cause of action for intentional misrepresentation: (1) a material misrepresentation, (2) that was intended to deceive, (3) that was made with the intention of inducing reliance, (4) that was justifiably relied upon, and, (5) that resulted in damage to the person who justifiably relied on it. *Kinnel v. Mid–Atlantic Mausoleums, Inc.*, 850 F.2d 958, 963–64 (3rd Cir.1988), *citing Scaife Company v. Rockwell–Standard Corporation*, 446 Pa. 280, 285 A.2d 451, 454 (1971), *cert. denied*, 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972).

The evidence submitted by Step–Saver in its case in chief failed to demonstrate by clear, precise, and convincing evidence the existence of several of these five elements, proof of all of which is required for recovery under its theory of intentional misrepresentation.

■ Pennsylvania law requires justifiable reliance. Step–Saver has failed to prove justifiable reliance by clear, precise, and convincing evidence. This element proved insurmountable for Step–Saver because of a conflict inherent in the case which it presented. The alleged misrepresentations at issue were made to employees of Step–Saver, all of whom claimed technical knowledge in the field of computer programming. These employees of Step–Saver testified that they relied on the representations of Software Link's salespeople, none of whom possessed knowledge in the field of computer programming. Step–Saver also presented some of its technicians to testify that they extensively tested all components of the multi-user system, including Multi–Link Advanced and its compatibility with other hardware and software in the Step–Saver multi-user system prior to its sale to Step–Saver customers. Step–Saver proceeded to sell its multi-user system only after its tests proved favorable. Step–Saver thus failed to prove by clear, precise and convincing evidence that its reliance was justifiable in light of the relationship of the parties involved and the nature of the

transaction. *Rempel v. Nationwide Life Insurance Company*, 471 Pa. 404, 370 A.2d 366, 369 (1977).

■ Step–Saver also failed to present any direct evidence concerning the falsity of the alleged misrepresentations by Software Link's employees. The indirect or circumstantial evidence was also insufficient to demonstrate falsity. Step–Saver failed to prove that Software Link knew the falsity of even one representation at the time it was made or that the Software Link representative made the false representation in conscious ignorance of or with reckless disregard for the truth. *Warren Balderston Co. v. Integrity Trust Co.*, 314 Pa. 58, 170 A. 282, 283 (1934).

■ Pennsylvania law also requires that to be actionable a misrepresentation must be of fact rather than merely of opinion. A seller may "puff" or give subjective opinions as to a product without making a material misrepresentation if the representations necessarily involve individual judgement such that, "even though made absolutely, the hearer must know that they can be based only on the speaker's opinion." 12 Williston § 1491 p. 349 (3rd ed. 1970); *see also Berkebile v. Brantly Helicopter Corporation*, 337 A.2d 893, 903, 462 Pa. 83 (1975). The alleged misrepresentations at issue, made in advertisements and by Software Link sales personnel, appear to concern Multi–Link Advanced's capacity to serve up to nine users and concerning Multi–Link Advanced's "compatibility" with the Wyse terminals and certain application software programs. By their nature, such representations were inherently subjective, relating to characteristics not subject to precise or exact determination. Williston § 1492 at 352. Moreover, none of the advertisements constituted technical specifications.

Step–Saver was obliged to present clear, precise, and convincing evidence of (1) a material misrepresentation, (2) that was intended to deceive, (3) that was made with the intention of inducing reliance, (4) that was justifiably relied upon, and, (5) that resulted in damage to the person who justifiably relied on it. Step–Saver failed to meet that evidentiary standard with respect to several of these elements and thus the Court did not commit error in granting Software Link's motion for a directed verdict as to Software Link's alleged intentional misrepresentations.

## II. *Allegations of Error with regard to Wyse Technology*

### A. Implied Warranty of Merchantability

■ Step–Saver alleges error in the Court's refusal to charge the jury on the implied warranty of merchantability. Trans. of Tr., July 9, 1990, at 117. Step–Saver failed to produce any evidence that the implied warranty of merchantability was violated.

In Step–Saver's request for the Court to charge the jury on the implied warranty of merchantability, it appeared that there was a failure on Step–Saver's part to differentiate between the warranty of merchantability and the warranty of fitness for a particular purpose. As stated in White and Summers, Uniform Commercial Code, § 9–9, p. 357–58 (2d ed. 1980),

> Those unfamiliar with the differences between the warranty of merchantability (fitness for the *ordinary* purposes for which such goods are used) and the warranty of fitness for a *particular* purpose often confuse the two; one can find many opinions in which the judge used the terms "merchantability" and "fitness for a particular purpose" interchangeably. Such confusion under the Code is inexcusable. Sections 2–314 and 2–315 make plain that the warranty of fitness for a particular purpose is narrower, more specific, and more precise....

> Note the conditions that are not required by the implied warranty of merchantability but that must be present if a plaintiff is to recover on the implied warranty of fitness for a particular purpose:

> (1) The seller must have reason to know the buyer's particular purpose.

> (2) The seller must have reason to know that the buyer is relying on the seller's skill or judgement to furnish appropriate goods.

(3) The buyer must, in fact, rely upon the seller's skill or judgement.

Section 2–314(2) of the Uniform Commercial Code states that to be merchantable, goods must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair and average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

U.C.C. § 2–314(2).

 The warranty of merchantability does not require that the goods be "outstanding or superior." They need only be "of reasonable quality within expected variations and for the ordinary purposes for which they are used." Anderson, 3 *Uniform Commercial Code*, § 2–314:29 at 136; *see also Sessa v. Riegle*, 427 F.Supp. 760, 769 (E.D.Pa.1977), *affirmed without opinion*, 568 F.2d 770 (3d Cir.1978). Acceptance in the trade, in addition to being an express requirement for merchantability under the Uniform Commercial Code, has long been a reliable barometer for determining whether a particular product is merchantable. Merchantability "includes as an element the warranty that the goods will pass in the trade without objection under the contract description." Anderson, § 2–314:31 at 138.

Step–Saver was thus obliged at trial to demonstrate not only the existence of the warranty (which is implied in virtually every transaction), but also the fact that the warranty was breached and that the breach was the proximate cause of the loss sustained by the buyer. Step–Saver put forth no evidence as to any defect in packaging or unusual variations in quality, much less any evidence that the Wyse–60 terminals would not be acceptable as computer terminals in the trade. Wyse introduced uncontroverted evidence that over one million Wyse–60 terminals have been sold since their introduction in April, 1986. The Wyse–60 terminal has exceeded all other terminals in its class in sales. Furthermore, before deciding on the configuration of the Step–Saver multi-user systems, Step–Saver put the Wyse–60 through a two part testing program. Step–Saver employees conducted comparison tests of the Wyse–60 terminal and at least two other terminals whose performance was found to be inferior to that of the Wyse–60. Step–Saver's second stage of testing was the "bench-testing" of individual terminals and systems prior to installation at customer locations, again with no indication of problems. The only defect alleged was incompatibility with certain software programs selected by Step–Saver, including Multi–Link Advanced, Benchmark and WordPerfect. No evidence was presented to suggest that compatibility with those programs was a criterion of merchantability according to the usage of the computer terminal trade. There were hundreds of other software programs used with such terminals. Thus, the evidence clearly established that the Wyse terminals met or exceeded the ordinary standards of the trade at the time of their installation at customer locations by Step–Saver personnel. The evidence in this case clearly supported the Court's ruling that Step–Saver failed to present evidence of a breach of the implied warranty of merchantability.

B. Fitness for a Particular Purpose

 Step–Saver further alleges that the Court erred in instructing the jury that in order to find liability for a violation of the implied warranty of fitness for a particular purpose the jury must find that Wyse *"was aware* of Step–Saver's *specific applications"* of the Wyse–60 terminals.

This allegation is a misstatement of the charge given by the Court. The Court charged the jury as follows:

In order to prove the implied warranty of fitness, Step–Saver must prove by a preponderance of the evidence, that Wyse, at the time of the sale to Step–Saver, had reason to know of the particular purpose for which the Wyse–60 terminals were being purchased by Step–Saver and that Step–Saver relied on Wyse's skill and judgement to select or furnish suitable terminals.

The Court's charge was correct. Furthermore, the interrogatory to which the jury answered "NO" reads:

Has Step–Saver proved by a preponderance of evidence that defendant Wyse Technology at the time of the sale to Step–Saver had reason to know of the particular purpose for which the Wyse–60 terminals were purchased and that Step–Saver relied on Wyse's skill or judgement, creating an implied warranty of fitness, and that the implied warranty of fitness was breached and that the breach was a proximate cause of damage to Step–Saver?

Finally, Step–Saver's counsel failed to take exception to the Court's charge regarding the implied warranty of fitness for a particular purpose. It is well established that a failure to object to a particular jury instruction precludes a later objection pursuant to a motion for a new trial or an appeal. 6A *Moore's Federal Practice*, ¶ 59.08[2].

### C. Unsigned Letter Which Was Never Sent

■ Step–Saver also alleges that the Court erred in excluding from evidence a document prepared by the Wyse local sales representative, Patrick Conte. The document, which was unsigned, was never sent. Instead, the letter was placed in a file because Step–Saver had commenced legal action against Wyse. The Court ruled regarding the letter in a sidebar conference as follows:

THE COURT: [Y]ou can ask him [Patrick Conte] a question like: Did you write a letter that you never sent? Is this the letter that you never sent? ... but I don't think you can ask him to read the contents of the letter because a letter ... is something that is to be communicated to X, and if ... never sent to X, I don't want to give the impression to anybody that it was a letter that went to X. You can ask him [what his thinking regarding the letter was], why he had a letter and why he didn't send the letter.... I'm not going to sit here and suggest questions that you can ask and can't ask. You ask him, and I will rule on them....

MR. CLARK (Counsel for Step–Saver): Your honor, can we, can we ask if a decision was made not to direct QED to proceed with the corrections regardless?

THE COURT: Of course you can ask him that. There is no question about that.

MR. CLARK: Thank you, your Honor. That's what we need.

Trans. of Tr., June 28, 1990, at 160–61.

The Court ruled that since the document had never been sent, it could not be read verbatim into evidence. The Court did not prohibit counsel for Step–Saver from asking any questions he wished about the document. As shown above, the Court explicitly permitted counsel to ask the document's author any number of questions regarding the contents of, purpose of, origin of, thinking behind, and reason for not sending the document. The Court properly prohibited counsel from reading the contents of the document into evidence because it was irrelevant as letter per se since it had been neither signed nor sent. The amount of prejudice to Wyse and confusion to the jury that the reading of this document into evidence as a communication by Mr. Conte clearly outweighed its probative value, especially considering the other avenues the Court left open to counsel to present to the jury any relevant facts surrounding the document. Counsel's failure to successfully pursue those alternative avenues does not change the propriety of the Court's ruling that the document itself should not be read into evidence.

### D. Rebuttal Testimony

■ Finally, Step–Saver alleges that the Court abused its discretion in not allow-

ing Step–Saver to put on rebuttal testimony. It has been well established in this Circuit "that on rebuttal it is properly within the discretion of the trial judge to limit testimony to that which is precisely directed to rebutting new matter or new theories presented by the defendant's case-in-chief." *Upshur v. Shepherd,* 538 F.Supp. 1176, 1180 (E.D.Pa.1982), *aff'd,* 707 F.2d 1396 (3d Cir.1983) *citing Bowman v. General Motors Corp.,* 427 F.Supp. 234, 240 (E.D.Pa. 1977). "Regarding rebuttal evidence, it is the 'usual rule' to 'exclude all evidence which has not been made necessary by the opponent's case in reply.'" *Upshur,* at 1180, *citing* 6 Wigmore's Evidence § 1873 at 672 (3d ed. 1940).

Rebuttal testimony is not a vehicle for a party to reemphasize its arguments to the jury prior to deliberation; nor is it an opportunity for the correction of any oversights in the plaintiff's case-in-chief. "It is well settled that evidence which properly belongs in the case-in-chief but is first introduced in rebuttal may be rejected, so as to avoid prejudice to the defendant and to ensure the orderly presentation of proof." *Emerick v. U.S. Suzuki Motor Corp.,* 750 F.2d 19, 22 (3d Cir.1984). The proposed rebuttal testimony was to be presented by Mr. Greebel, president of Step–Saver, who testified in plaintiff's case-in-chief. Plaintiff's proposed to recall Mr. Greebel "to describe what the Wyse products were supposed to do, what they did do and why they were defective" (Trans. of Tr., July 9, 1990, p. 7). This was the sum and substance of the evidence that was presented by Step–Saver in its case-in-chief. Step–Saver has shown no element of surprise in the defendant's case that would have justified the Court allowing it rebuttal testimony, nor has it shown any injustice resulting from the Court's denial.

The verdict in this case did not result in a miscarriage of justice. There was no manifest error of law, nor was there any manifest error of fact. Upon examination and consideration of the allegations of error set forth by Step–Saver in its motion for a new trial, the Court finds that none of them, either alone or considered together, provide any basis for a new trial. The plaintiff's motion for a new trial will therefore be denied.