**Paul PLATE, as Trustee for the Next of Kin of Dane Sebastian Terwey, Appellant,**

v.

**ST. MARY'S HELP OF CHRISTIANS CHURCH, Defendant and Third-Party Plaintiff, Respondent,**

v.

**Clyde TERWEY, et al., Third-Party Defendants.**

No. C5–94–117.

Court of Appeals of Minnesota.

Aug. 9, 1994.

Review Denied Oct. 14, 1994.

Stephen C. Fiebiger, Stephen C. Fiebiger, & Associates, Chartered, Minneapolis, for appellant.

Robert M. Frisbee, Edina, for respondent.

Considered and decided by RANDALL, P.J., and HARTEN and HAROLD W. SCHULTZ, JJ.

## OPINION

HAROLD W. SCHULTZ, Judge.*

Paul Plate, as trustee for the next-of-kin of Dane Sebastian Terwey, appeals from a judgment and order denying posttrial motions, claiming (1) the trial court erred in directing a verdict for respondent Diocese of

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

St. Cloud, (2) the evidence does not support the verdict, and (3) the trial court erred in formulating the jury instructions. We affirm.

## FACTS

On June 30, 1991, five-year-old Dane Terwey visited the parish cemetery of respondent St. Mary's Help of Christians Church (the parish) with his parents, Clyde and Marylou Terwey, and his younger sister. After the Terwey family visited the graves of two relatives, they began walking toward their car. Clyde Terwey carried his daughter, while Marylou Terwey "shepherded" Dane by holding his hand or by putting her hands on his shoulders. At some point during the walk, Dane slipped away from his mother. Shortly, Clyde Terwey heard a creaking noise and a thud and they both turned to discover a large grave monument on top of their son.

The Terweys rushed Dane to a nearby house, where they called 911 and began CPR. When law enforcement officials arrived, Clyde Terwey stated that Dane had been playing around or had crawled onto the monument.[1] Tragically, Dane Terwey suffered serious injuries from the crushing weight of the monument and died a short time after he reached the hospital.

On April 7, 1992, the Stearns County District Court appointed appellant Paul Plate (the trustee) as trustee for the next-of-kin of Dane Terwey. Thereafter, the trustee sued the parish and respondent Diocese of St. Cloud (the diocese) in a wrongful death action. The trustee alleged that the diocese was vicariously liable for the acts or omissions of the parish and its cemetery committee. Additionally, the trustee asserted a claim against the diocese for negligent selection and supervision of the parish priest. Respondents denied liability, and the parish brought a third-party action against Clyde and Marylou Terwey for contribution or indemnity.

1. The law enforcement officials and an expert witness concluded that Dane Terwey was probably trying to climb the monument when it fell on top of him.

The matter came on for jury trial in September 1993. The evidence revealed that the monument that crushed Dane Terwey was erected in about 1918. It stood approximately four feet high, was centered on its base by a pin measuring one and five-eighths of an inch, and weighed approximately 300 pounds. Any mortar used to secure the monument to its base had deteriorated, and the monument, when standing on its base, leaned to one side. Based upon the condition of the monument, its weight and dimensions, an expert witness opined that a force of 10 to 12 pounds was sufficient to tip it from its base. Dane Terwey weighed about 45 pounds.

At trial, numerous witnesses testified about the parish cemetery committee responsible for cemetery maintenance. The cemetery committee consists of the parish priest and five lay members of the church. In the late 1980s, the cemetery committee made several improvements and repairs in the cemetery. While making these improvements, the committee noted that numerous smaller marble markers had disintegrated or were otherwise in bad repair, and investigated resetting these markers. Despite this investigation, the committee did not reset the markers. Additionally, the committee knew before the accident that some larger monuments leaned to one side. After the accident, the committee examined other larger monuments and found several that could be rocked back and forth, and several that could be tipped over. The committee obtained an estimate for resetting the monuments and markers of $35 apiece, but the committee did not reset them.

The parish priest and the Vicar General of the diocese also testified about the parish and its relationship to the diocese. The parish is a nonprofit religious corporation and, although it is a part of the St. Cloud Diocese, it has a separate corporate identity. The parish corporate board consists of the Bishop and Vicar General of the diocese, the parish priest, and two lay members.

According to the witnesses, the parish priest operates the church independent of the diocese. The parish purchases liability insurance through the diocese for purposes of obtaining a lower group rate, but it pays its own premiums and is not required to participate in this insurance pool. Additionally, the parish invests funds in a diocesan "loan pool," which is open to all parishes in the diocese and which offers low-interest loans and a better interest rate than commercial banks.

The diocese is also a nonprofit religious corporation, consisting of about 140 parishes. The diocese's articles of incorporation allow the diocese to establish and maintain cemeteries within the diocese. The Bishop heads the diocese and is assisted by the Vicar General. The Bishop appoints parish priests and has the exclusive power to remove them. Additionally, the Bishop has the exclusive power to open or close a parish. Apart from these powers, however, the Bishop does not direct or otherwise control the operation of the individual parishes.

The diocese receives annual financial reports from each parish, which contain financial information on the parish cemetery. The diocese uses all of the financial information to calculate an annual assessment that the parish pays to the diocese for seminarian programs, priest training, diocesan operating expenses, and other ministerial programs.

At the close of plaintiff's case-in-chief, the parish moved for a directed verdict, which the trial court ultimately denied. The diocese also moved for a directed verdict. The court directed verdicts for the diocese on all claims except vicarious liability. As to that issue and over the trustee's objection, the court heard testimony from two defense witnesses "as an offer of proof" outside the jury's presence and then directed a verdict for the diocese on the final claim against it. The court concluded that the diocese was a corporation separate from the church and had no control over the parish cemetery.

The parish then presented testimony from one witness and rested. The jury returned a special verdict finding Clyde and Marylou Terwey not negligent, finding the parish not negligent, and finding total damages of $25,000. The court incorporated the special verdict findings into its order for judgment. The trustee moved for a new trial or JNOV, which the court denied. Thereafter, judg-

ment was entered and the trustee filed a notice of appeal.

## ISSUES

I. Did the trial court err in directing a verdict for the diocese on the issue of vicarious liability?

II. Does the evidence support the verdict of no negligence?

III. Did the trial court abuse its discretion in formulating the jury instructions?

## ANALYSIS

### I. *Directed Verdict*

■ The trustee argues the trial court erroneously directed a verdict for the diocese on the vicarious liability issue and specifically challenges the procedure implemented by the court. Minn.R.Civ.P. 50.01 allows a party to move for a directed verdict at the close of the opponent's evidence or at the close of all evidence. The rule is silent as to any other timing for such a motion, and no Minnesota cases address alternate timing for directed verdict motions. We agree that the procedure here was awkward. Nevertheless, the trustee has not shown any prejudice from the procedure. *See Panotex Pipe Line Co. v. Phillips Petroleum Co.,* 457 F.2d 1279, 1283 (5th Cir.1972) (timing of directed verdict is within trial court's discretion unless it violates procedural due process or denies a fair trial), *cert. denied* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 86 (1972). The trustee was able to cross-examine the witnesses during the offer of proof and to make arguments on the directed verdict motion. Thus, we conclude the trial court did not abuse its discretion in its unusual handling of the directed verdict motion. *See id.* at 1281–83.

■ As to the substantive challenge to the directed verdict, we consider whether a contrary verdict would be manifestly against the evidence or whether a contrary verdict would comply with the governing law. *Advanced Training Sys., Inc. v. Caswell Equip. Co.,* 352 N.W.2d 1, 11–12 (Minn.1984). The directed verdict motion presents a legal question concerning the sufficiency of the evidence to create a fact question. *Peterson*

*v. Little–Giant Glencoe Portable Elevator Div.,* 366 N.W.2d 111, 115 (Minn.1985). We consider the evidence in the light most favorable to the non-moving party. *Alevizos v. Metropolitan Airports Comm'n,* 452 N.W.2d 492, 502 (Minn.App.1990), *pet. for rev. denied* (Minn. May 11, 1990).

The trustee argues that he presented sufficient facts to create a fact question concerning the vicarious liability of the diocese. The trustee argues he presented a prima facie case showing an agency relationship between the diocese and the parish that precludes a directed verdict. We disagree.

Minnesota courts have adopted the Restatement definition of agency, which states that "agency" refers to

> "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act."

*Jurek v. Thompson,* 308 Minn. 191, 197, 241 N.W.2d 788, 791 (1976) (quoting Restatement (Second) of Agency § 1 (1957)). The determination of an agency relationship does not depend upon the intent of the parties to create it nor upon the label that they attach to their relationship. *PMH Properties v. Nichols,* 263 N.W.2d 799, 803 (Minn.1978). "[A]gency is a legal concept which the law imputes to the factual relation between the parties." *Id.* at 802. The party alleging agency relationship bears the burden of proof. *White v. Boucher,* 322 N.W.2d 560, 566 (Minn.1982). Where the evidence is disputed, whether this factual relation exists is a question of fact for jury resolution. *PMH,* 263 N.W.2d at 803.

Here the record reveals that although the Bishop has the exclusive power to hire and fire parish priests and the exclusive power to open and close parishes, the Bishop has nothing to do with the operation of the parish itself. The Bishop and Vicar General are members of the parish corporate board, but they do not attend board meetings and they give their proxies to the parish priest. The parish is financially independent, it is a separate corporation, and it is the sole owner of its property, including the cemetery. While respondents' answers to interrogatories stat-

ed the parish is insured through a diocesan policy, all witnesses explained that the parish participates in an insurance "pool" with other parishes in the diocese in order to obtain a lower group rate. The parish pays its own individually calculated premiums, receives a separate certificate of insurance, has different coverage types and limits than other parishes, and receives any payment directly from the insurance company. Participation in the insurance pool is strictly voluntary. Likewise, participation in the diocesan loan pool is strictly voluntary and the pool exists to provide low interest loans and an investment opportunity for local parishes. Finally, the diocesan assessments are used to support educational and ministerial missions that the parish benefits from but cannot afford alone.

This evidence, viewed in favor of the trustee, does not show that the diocese consented to have the parish act on its behalf or subject to its control. Moreover, the record is devoid of evidence showing that the parish agreed to be controlled by the diocese. Accordingly, we conclude the trial court properly directed a verdict for the diocese.

## II. *Sufficiency of the Evidence*

On appeal from a denial of JNOV, the reviewing court considers the legal question of whether the evidence is "practically conclusive against the verdict." *Seidl v. Trollhaugen, Inc.*, 305 Minn. 506, 507, 232 N.W.2d 236, 239 (1975). Similarly, a special verdict containing the jury's factual findings will not be reversed unless the findings are palpably contrary to the evidence. *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 381 (Minn.1990). In either situation, the evidence is considered in a light favorable to the verdict. *Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984) (special verdict); *B.F. Goodrich Co. v. Mesabi Tire Co.*, 430 N.W.2d 180, 182 (Minn.1988) (JNOV).

Here, there is evidence that could support a finding that the parish was negligent. The cemetery committee knew before the accident that smaller marble monuments had come loose from their footings, and knew that cemetery monuments were leaning. Other evidence, however, supports the finding that the parish was not negligent. The cemetery committee did not know that the leaning monuments could be easily tipped. There was no evidence as to the "industry standard" for cemetery maintenance and repair. The evidence showed that the cemetery committee regularly maintained the cemetery and repaired obvious dangers, such as sunken graves. Moreover, leaning monuments are a common sight in small country cemeteries, and the jury itself viewed the cemetery. The jury could have easily concluded that the cemetery committee was acting with reasonable care in maintaining the cemetery. Accordingly, we conclude the evidence supports the jury's finding that the parish was not negligent.

The trustee also challenges the damages as inadequate. We decline to address this issue, however, because the jury found all parties not negligent. *See Wefel v. Norman*, 296 Minn. 506, 508, 207 N.W.2d 340, 341 (1973) (where jury has determined defendant not negligent, alleged inadequate damages award not necessarily prejudicial).

## III. *Jury Instructions*

The trial court exercises broad discretion in formulating jury instructions. *State Farm Fire & Casualty Co. v. Short*, 459 N.W.2d 111, 113 (Minn.1990). A party is entitled to a specific instruction, however, if there is evidence supporting it and the instruction comports with the governing law. *Id.* An instruction is generally considered sufficient if it fairly states and clearly conveys the legal principles to the jury. *Sandhofer v. Abbott–Northwestern Hosp.*, 283 N.W.2d 362, 367 (Minn.1979). The instruction is reviewed as a whole and will not be cause for reversal unless it constitutes an abuse of discretion. *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn.1986).

The trustee argues the trial court erred in giving certain instructions and in refusing to give other instructions. We disagree. Our review of the record reveals that the instructions fairly and clearly stated the applicable law. *See Sandhofer*, 283 N.W.2d at 367. Moreover, both parties fully argued their theories of the case to the jury. Accordingly, we conclude the jury instruction as a whole did not constitute an abuse of discretion.

**Affirmed.**